[S.F. No. 24395. Jan. 27, 1983.]

MARCELLA STAFFORD, Plaintiff and Respondent, v.
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Defendant and Appellant.

320

<span style="display:none"></span>

COUNSEL

Marco E. Lopez, Carlos M. Alcala, Carmen S. Flores, Federico G. Chavez and Ellen J. Eggers for Defendant and Appellant.

Vance J. Van Tassell, Joseph M. Fornasero, Sharyn J. Van Tassell, Van Tassell, Fornasero & Van Tassell and John Mullen for Plaintiff and Respondent.

OPINION

KAUS, J.—United Farm Workers of America, AFL-CIO (the union), defendant in a personal injury action tried to a jury, appeals from a judgment holding it liable for plaintiff's injuries sustained in a traffic accident. The union contends that the trial court erred in admitting into evidence a temporary restraining order directed against it. We conclude that the evidence should have been excluded and that the error in admitting it was prejudicial.

I.

This case arises out of a three-car collision on September 19, 1974, before sunrise. Striking union farm workers were about to picket a tomato field alongside a county highway. Encarnacion Avalos and his son Jesse, tomato sorters who had walked off their jobs to join the strike, parked their pickup truck along the right side of the northbound lane of the highway, near the edge of a dirt road leading to a tomato field east of the intersection. Plaintiff's evidence—hotly contested by the union—was that the Avalos' truck occupied 4 feet of the northbound lane and blocked 10 feet of the 24-foot wide dirt road. The Avalos' were waiting for the union picket captain to arrive so that picketing could begin. At least one other truck was parked in front of the Avalos' vehicle. Plaintiff Marcella Stafford, a hospital nurse, was northbound on the highway driving to work. A third vehicle, heading south, was driven by a nonstriking farm worker, Guadalupe Avilla. She had started to make a left turn toward the dirt road.

Construing the evidence in a light most favorable to the plaintiff, she hit the Avalos' pickup truck, swerved and struck Avilla's car which was at least two feet over the line into plaintiff's lane.[1] Plaintiff was injured. She sued the union[2]

---

[1] Defendant's version of the facts is that plaintiff struck the oncoming Avilla car and then sideswiped the parked Avalos pickup.

[2] Before trial, plaintiff dismissed Avalos and Avilla as defendants, preferring to seek damages solely from the union.

on the theory that the accident was caused by the Avalos' truck protruding westerly onto the highway causing her to swerve and strike the Avilla car which had been left "stuck" two feet over the center line because the truck's partial blocking of the dirt road prevented Avilla from completing her left turn. The union's legal responsibility for the claimed negligent placement of the Avalos' truck was urged on two theories: (1) vicarious liability for Avalos' negligence as agent of the union, and (2) the union's own negligence in failing to direct and supervise the parking of the pickets' vehicles.

A key procedural issue at trial was the admissibility of a temporary restraining order (TRO) issued against the union about a week before the accident. It prohibited the union in various ways from blocking access to the tomato field and barred other conduct such as rock throwing, violence, and threatening behavior. The union moved *in limine* to exclude all references to the TRO. After first holding that the order was inadmissible as unduly prejudicial and likely to cause unnecessary confusion and delay, the trial court reconsidered and allowed it into evidence, even though it had explicitly found that the TRO "was designed to protect growers and union people from violence and members of the public from violence by way of the strike and not simply negligent motor vehicle operation on a public highway." The TRO was read in full to the jury, referred to frequently during the trial, and emphasized in plaintiff's closing argument.[3]

---

[3]The TRO, which was also admitted as a written exhibit, read as follows: " 'Upon reading the verified Complaint for Injunction on file in this action; the supporting Declarations and Points and Authorities filed therewith, and hearing the arguments of counsel, it appears to the satisfaction of the Court therefrom that this is a proper cause for the granting of a Temporary Restraining Order and an Order to Show Cause, and that unless a Temporary Restraining Order is granted as prayed for, Plaintiff's tomato grower members will suffer great and irreparable injury before the matter can be heard on notice: [¶] Now, THEREFORE, IT IS HEREBY ORDERED that the above named Defendants are, and each of them is, ordered to appear before this Court at the Yolo County Courthouse, Woodland, California, on the 26th day of September, 1974 at 10:00 a.m., then and there to show cause, if any they have, why they and their officers, agents, representatives, employees and members and all other persons acting at the direction of, or in combination with, said Defendants, should not be enjoined and restrained during the pendency of this action, from: [¶] (a) Picketing, standing, sitting, loitering, gathering, assembling, massing, parading, walking, stopping, or stationing, placing or maintaining any pickets or any other persons at, on, or within the facilities and properties noted in Schedule A attached hereto, or in the traffic lanes of a public street or highway, the use of which is necessary for ingress to or egress from said properties or facilities. [¶] *Provided, however,*: [¶] (1) that where there is regular ingress and egress to or from said properties, facilities or ranches from public roads customarily and regularly used by vehicular traffic, not more than three (3) pickets may be stationed within fifty (50) feet of each side of any said regular ingress or egress; [¶] (2) that pickets shall not stand in, parade or march across any said ingress or egress or any public or private road in the vicinity of said properties, the use of which is necessary for ingress or egress to or from said properties, facilities or ranches, nor in any other manner physically interfere with or obstruct said ingress or egress of public roads in the vicinity thereof; [¶] (3) that pickets shall not be upon the private property of Plaintiff's members described in Schedule A; [¶] (4) that where there is public property adjacent to the private property of Plaintiff's members described in Schedule A, and there is compliance with all other requirements of this Order, the placing or maintaining of pickets on such public property is not hereby restrained. [¶] (b) Parking or placing their vehicles in such a manner as deliberately to obstruct the free flow of traffic into and out

The jury found the union liable and awarded $100,000 in damages.

## II.

■ The TRO was irrelevant and prejudicial. The only issues at trial were (1) whether parking the pickup truck which may have protruded onto the highway and partially blocked the access road amounted to negligence justifying a finding of liability, and (2) whether the union was directly or vicariously liable for such negligent parking.[4] The TRO which was not intended as a traffic control device had no bearing on either issue.

---

of said facilities and properties. [¶] (c) Injuring persons or destroying or damaging property of Plaintiff's tomato grower members, their employees, agents, customers, contractors or of others, and from engaging in conduct calculated or likely to cause or causing injury to persons or damage to property, including, but not limited to, the throwing of clods, rocks, tomatoes or other objects. [¶] (d) Pursuing a course of conduct towards employees, agents, customers, contractors, and their respective employees, or members of their families by automobile or otherwise in such a manner as to deliberately cause them to slow down, stop or impede their progress. [¶] (e) Molesting, assaulting, pushing, elbowing, shouldering, or in any other manner unreasonably intentionally physically contacting the person or the clothing of any of Plaintiff's tomato grower members' agents, representatives, visitors, invitees, employees, customers, contractors, suppliers, common carriers or others doing or attempting to do business with Plaintiff's tomato grower members, or their respective employees. [¶] (f) Causing or inducing, or attempting to cause, or induce by word or conduct, any reasonable fear of physical molestation, injury or damage to person or property of Plaintiff's tomato grower members' employees. [¶] IT IS FURTHER ORDERED, that willful disobedience of Paragraphs (a) through (f) of above on the part of any person shall be deemed a violation of Section 166.4 of the California Penal Code, and the appropriate law enforcement officials may take such action as to them appears necessary, including, but not limited to, arresting violators, in order to insure full and complete obedience and compliance with paragraphs (a) through (f) of this Order. [¶] IT IS FURTHER ORDERED that Defendant Union take the following action within two (2) days hereof: Post at all offices or headquarters it maintains within Yolo, Solano and Sutter Counties, on bulletin boards or other places where notices to members are normally, routinely and customarily posted, a copy of this Temporary Restraining Order in Spanish and English. [¶] IT IS FURTHER ORDERED that pending the hearing of this Order to Show Cause, said Defendants above named, and each of them, and each and every and all persons acting at the direction of, or in combination or concert with, Defendants, be and hereby are, restrained and enjoined from doing any of the acts or things hereinabove set forth in paragraphs (a) through (f) hereof. [¶] IT IS FURTHER ORDERED that a bond in the amount of ($100,000) be provided.' "

[4] On the issue of the union's direct liability, the complaint alleged that it "did direct and encourage each of its members, participants and advisers to park their automobiles in the proximity of the roadway where the accident occurred, and did negligently supervise and direct the parking of the same." No other negligent act or omission is alleged. We emphasize this because on appeal plaintiff refers us to certain unobjected hearsay testimony by the owner of the struck ranch that he had been told that the pickets had jumped off a truck, stood in the "entranceway" to the field and shouted to nonstrikers not to enter the field. He "guessed" that this was when the accident happened. This testimony is quite uncorroborated and contradicted by two eyewitnesses, including Guadalupe Avilla. Suffice it to say that at the trial plaintiff was true to her pleading: this supposed conduct by the pickets was never—not in the opening statement, nor in the closing argument—cited as negligent conduct which had anything to do with the accident. We note this merely for the record and do not mean to imply that our holding with respect to the admissibility of the TRO would differ had plaintiff relied on the pickets' shouting as one of the causes of the accident.

Although we have found no case discussing an injunction or TRO as relevant to the duty of care in a negligence action, the rule with respect to statutes is obviously analogous. In California, the relation between a statute and negligence is governed by Evidence Code section 669,[5] which codifies general judicially created doctrines.[6] Our courts have interpreted section 669 broadly, applying it to police department manuals (*Peterson* v. *City of Long Beach* (1979) 24 Cal.3d 238, 245-246 [155 Cal.Rptr. 360, 594 P.2d 477]) and Administrative Code safety orders (*Short* v. *State Compensation Ins. Fund* (1975) 52 Cal.App.3d 104 [125 Cal.Rptr. 15]). ▮ In any event, the law is clear and well-settled that for a statute or ordinance—and, by analogy, an injunction or TRO[7]—to be relevant to a determination of negligence, not only must the injury be a proximate result of the violation, but the plaintiff must be a member of the class of persons the statute or order was designed to protect, and the harm must have been one the statute or order was designed to prevent. (§ 669, subds. (a)(3), (4); *Vesely* v. *Sager* (1971) 5 Cal.3d 153, 164 [95 Cal.Rptr. 623, 486 P.2d 151]; *Nunneley* v. *Edgar Hotel* (1950) 36 Cal.2d 493, 497 [225 P.2d 497].) ▮ Here, even if a violation of the TRO was a contributing cause of the accident, the other two elements were absent. By its own terms the TRO protected only the class of tomato growers and those with whom they do business, not passing motorists. Even more vitally, the TRO was designed to prevent labor violence, not automobile collisions.

Plaintiff argues that though the TRO might have been irrelevant to a finding of negligence in parking the pickup truck, it was relevant on the question of the union's negligent failure to supervise its members. She points to testimony by Richard Chavez, a member of the union's executive board, that it was the union's responsibility to familiarize pickets with the contents of the TRO. This she contrasts with evidence from Encarnacion Avalos that he and the other pickets were "never told . . . anything."[8] The argument, if we understand it

---

[5] Section 669 provides in relevant part: "(a) the failure of a person to exercise due care is presumed if: [¶] (1) He violated a statute, ordinance, or regulation of a public entity; [¶] (2) The violation proximately caused death or injury to person or property; [¶] (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and [¶] (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted."

[6] The Law Revision Commission comment to section 669 explains: "Section 669 codifies a common law presumption that is frequently applied in the California cases. [Citations]." Before section 669 was enacted, we applied similar requirements in a host of cases, requiring that the plaintiff be a member of the class protected by the statute and that the injury be one the statute was designed to prevent in order for a presumption of negligence to arise. (See, e.g., *Alarid* v. *Vanier* (1958) 50 Cal.2d 617 [327 P.2d 897]; *Nevis* v. *Pacific Gas & Electric Co.* (1954) 43 Cal.2d 626 [275 P.2d 761]; *Satterlee* v. *Orange Glenn School Dist.* (1947) 29 Cal.2d 581, 590 [177 P.2d 279]; *Siemers* v. *Eisen* (1880) 54 Cal. 418.)

[7] See generally Traynor, *Statutes Revolving in Common-Law Orbits* (1968) 43 State Bar J. 509.

[8] A little later the witness amended his answer and testified that "the only thing that they instructed us about is not to place the cars where they would be in the way."

correctly, is that the union's lack of due care in omitting to publicize the contents of the TRO, is relevant on the question whether its alleged failure to tell the pickets where not to park their vehicles was negligent. In other words, the jury was invited to infer the negligent quality of the latter omission from the union's negligence with respect to the former. That, of course, is precisely what is prohibited by section 1104 of the Evidence Code—itself a codification of existing law (*Towle* v. *Pacific Improvement Co.* (1893) 98 Cal. 342 [33 P. 207]): "[E]vidence of a trait of a person's character with respect to care or skill is inadmissible to prove the quality of his conduct on a specified occasion." (See also *Brokopp* v. *Ford Motor Co.* (1977) 71 Cal.App.3d 841, 850-853 [139 Cal.Rptr. 888, 93 A.L.R.3d 537].)

The TRO was, therefore, not admissible on the theory that the union's negligent failure to publicize its ban on obstruction of ingress into the fields implied negligence on the issue of lack of directions where to park. This does not mean, of course, that plaintiff was not free to prove and argue that the union, having caused the Avalos' truck and others to congregate at the scene, was under a common law duty to control their conduct in some fashion.

Finally, even if the union's failure to communicate the portions of the TRO prohibiting the blocking of ingress to the field did have some bearing on union's negligence liability, there was no justification for admitting the entire TRO into evidence. It contained completely irrelevant and highly prejudicial paragraphs forbidding assaults, threats of violence and destruction of property. Thus the TRO provided in part: ". . . it appears to the satisfaction of the Court . . . that unless a Temporary Restraining Order is granted as prayed for that Plaintiff's tomato grower members will suffer great and irreparable injury before the matter can be heard on Notice: [¶] [The union must show cause that it] should not be enjoined and restrained during the pendency of this action from: . . . [¶] Injuring persons or destroying or damaging the property of Plaintiff's tomato grower members, their employees, agents, customers, contractors or of others; and from engaging in conduct calculated or likely to cause or causing injury to persons or damage to property, including, but not limited to, the throwing of clods, rocks, tomatoes or other objects. [¶] . . . [¶] Molesting, assaulting, pushing, elbowing, shouldering or in any other manner unreasonably intentionally physically contacting the person or the clothing of any of Plaintiff's tomato grower members' agents . . . employees . . . or others doing or attempting to do business with [them]; [¶] Causing or inducing, or attempting to cause . . . any reasonable fear of physical molestation, injury or damage to person or property of Plaintiff's tomato grower members' employees."

We find no conceivable probative value in these paragraphs. The picture painted is one of a violent, dangerous, and irresponsible union requiring

judicial curbing to prevent the impending "irreparable injuries" of bloodshed, property destruction, and wholesale intimidation. Undoubtedly the inference drawn by the jury was that the judge making such an order did so on the basis of reasonably grounded concern that the order was warranted by experience.

Nor did plaintiff's counsel fail to make the most of the erroneous ruling.[9] The union's failure to comply with the TRO was, in his own words, the "theme" of his closing argument. Counsel portrayed the union as deliberately bent on ignoring the law and court orders, as an organization that had to be punished, that needed to receive a "message" that courts and the law could not be ignored with impunity. "We have, I think, a lot of evidence that indicates that the Defendants were intent upon kind of doing what they wanted *without any fear of what our statutes are and even without any fear of what our superior courts say in the way of a temporary restraining order* . . . . [¶] So, if they won't comply with being responsible; and they have been irresponsible, another word for negligence, then I think it would be good to send them a message; a telegram. . . [W]hat it really keeps boiling down to, to me, is when you get to this stage of the trial, I think the question is, can they get away with it? Can they ask to have all the privileges and the rights and the protection of the law, on the one hand, and negligently and irresponsibly thwart it on the other? And the question is, can they get away with it? I think we need to send them a message—and this will be the first of its kind—that says, 'No, you can't.' I think we need to send them a message that says, *'If you won't listen to the restraining orders* or the statutes, or you weren't being reasonable, then we want you to listen to this, here's our message: And the message is called a verdict.' " (Italics added.)

---

[9]Testimony referring to the TRO, measures taken to inform union members of it, and the union's intended compliance or noncompliance, fell on the jury like volcanic ash. In the relatively short trial, the reading of the TRO itself covered six pages of transcript, and discussion of the TRO or its violation cropped up during the testimony of virtually every witness called thereafter, except those testifying exclusively about medical injuries.

Plaintiff's witness DeBo, owner of the picketed field, testified about conduct of union members violating the TRO, and the TRO was mentioned explicitly in connection with the strikers "causing a problem in the entranceway." (See fn. 4, *ante.*)

The deposition of Richard Chavez had been taken by plaintiff and was read to the jury. At the deposition plaintiff's counsel had tried to establish what measures a responsible union takes in order to comply with a TRO such as the one in question. His questioning also suggested that the TRO was inimical to the union's goal of interfering with the successful harvesting of the struck farm's crop—thus implying a basic conflict between the law and the union's aims.

But the most constant and prejudicial references came during the cross-examination of the union's final witness, Al Rojas, the union organizer in charge of the strike. The TRO was referred to several times during his direct testimony in connection with how it was communicated to pickets and how the union would ensure compliance. On cross-examination, after a series of questions about whether the union intended to portray itself as "rougher and tougher" than the rival Teamsters' Union and whether it intended to "interfere" with a grower's harvest by "harrassing his crops [sic]," counsel asked Rojas, in reference to his wife, who was his assistant, "Did you witness her being served with a restraining order, when she threw it at them and spat at them?" Counsel referred several more times to the TRO and instruction of union pickets. He continually returned to the subject, discussing the union's desire—or lack thereof—to abide by

## III.

The erroneous admission of the TRO was clearly prejudicial. To be fair it seems highly probable that when the trial court first allowed it—"as one of the circumstances relevant to the common law negligence issue"—it did not anticipate that it would become the centerpiece of plaintiff's attack against union. Yet that is precisely what happened: Plaintiff's counsel adroitly turned a simple issue of negligence into an OSC in re contempt—a referendum on whether the jury should "send a message" to union that restraining orders cannot be violated with impunity. None of this had anything to do with the simple issues of whether the Avalos truck was illegally parked and whether the union was legally responsible therefor.

The judgment is reversed.

Broussard, Acting C. J., Mosk, J., Richardson, J., Rouse, J.,* Feinberg, J.,* and Newsom, J.,* concurred.

---

the TRO. "Q: Do you remember saying, as an organizer for the UFW, that the court order— the union may not be willing to abide by a ruling that would cripple its strike against tomato growers? . . . A: . . . I may have said that. Q: Okay. So I understand that, if this court's—Yolo County Superior Court's Restraining Order would in any way cripple your strike, then, in your opinion, you wouldn't abide by the Order? A: Well, that would depend . . . . [o]n the health and safety of people. Q: And you'd be the person who made that decision, I guess, not the Superior Court Judge? A: I'd make the decision . . . . Q: And you were to have been here Friday [when the witness in fact failed to appear] . . . ? A: My understanding, yes . . . . Q: You just sort of substitute your own judgment for the Court's Order generally, don't you? . . ." After a brief recess, plaintiff's counsel again went to the subject of the TRO, Rojas' potential disregard for it, and the contempt sanction for violation.

*Assigned by the Acting Chairperson of the Judicial Council.