[No. A092274. First Dist., Div. One. Oct. 26, 2001.]

KAREN NISHIHAMA, Plaintiff and Respondent, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Appellant.

300

**COUNSEL**

Louise H. Renne, City Attorney, Joanne Hoeper, Joshua N. Sondheimer and David B. Newdorf, Deputy City Attorneys, for Defendant and Appellant.

Robert A. Harlem, Inc. & Associates, B. Mark Fong; Law Office of Bryce C. Anderson and Bryce C. Anderson for Plaintiff and Respondent.

**OPINION**

**STEIN, Acting P. J.**—A jury awarded $99,064 to plaintiff Karen Nishihama for injuries sustained when she tripped and fell in a crosswalk maintained by the City and County of San Francisco (City). The City appeals from a judgment entered on the jury's verdict, and from denials by operation of law of the City's motions for judgment notwithstanding the verdict and for a new trial. We reject the City's claims that the verdict was tainted by evidentiary and instructional error, and by improper argument by plaintiff's attorney. We find, however, that the jury improperly awarded plaintiff certain medical costs that she did not incur. We therefore will modify the judgment by reducing the damages award from $99,064 to $85,496.

FACTS

On November 3, 1997, plaintiff stepped from a bus platform at 4th and Market Streets, into a pothole in a crosswalk maintained by the City. Plaintiff fell, suffering a fractured fibula and a dislocation fracture of the tibia.

The pothole was described as four inches wide, three inches deep and two feet long. It extended from a trolley track running along Market Street to the bus platform. Susan Kircher, a City employee whose job included inspecting the trolley tracks at 4th and Mission streets, could not remember having seen

the pothole prior to plaintiff's fall. She testified, however, that she might have known about the pothole, and might have reported it. She thought it might have been repaired but that the repair did not last. Plaintiff also introduced evidence that inspections of the track and nearby areas were done as a matter of routine for the purpose, among others, of discovering and repairing defects such as the pothole at issue. She produced witnesses who frequented the area and testified that they had observed the pothole for at least six months prior to the accident. She also called an expert witness, who testified that after examining photographs of the pothole, he reached the opinion that the pothole had existed for approximately six months prior to the accident.

The City countered with evidence that there had been no citizen complaints about the pothole prior to plaintiff's accident. The City's expert opined that the pothole could have developed in a matter of days or weeks.

DISCUSSION

I.

*The City's Claims of Evidentiary and Instructional Error*

A public entity is not liable for injuries except as provided by statute, and Government Code section 835 sets out the exclusive conditions under which a public entity may be held liable for injuries caused by a dangerous condition of property. (Gov. Code, §§ 815, 835; *Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 829 [15 Cal.Rptr.2d 679, 843 P.2d 624].) Under Government Code section 835, "a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: [¶] (a) [a] negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) [t]he public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

The City, therefore, could not be held responsible for the ordinary negligence of its employees—except to the extent a negligent act caused the dangerous condition, which was not a question here. It also follows that it would have been error to instruct the jury that the City would be liable, on a

theory of respondeat superior, for the ordinary negligence of its employees. (*Hilts v. County of Solano* (1968) 265 Cal.App.2d 161, 169-172 [71 Cal.Rptr. 275]; *Owen v. City of Los Angles* (1947) 82 Cal.App.2d 933, 942 [187 P.2d 860]; *Pittam v. City of Riverside* (1932) 128 Cal.App. 57, 67 [16 P.2d 768].) The City contends that the trial court accordingly erred in permitting plaintiff's attorney over defense objection to ask City employees and witnesses if the condition of the pothole was such that a City employee should have noticed it during the course of a routine inspection, if a City employee would have called for its repair had it been noticed, or if it warranted repair. In addition, according to the City, the trial court erred in instructing the jury on agency principles, including that it was established that various City employees "were the agents of defendant City & County of San Francisco [and] [t]herefore, any act or omission of those persons was in law [an] act or omission of defendant City & County of San Francisco."

The evidence of which the City complains, however, and the instructions on agency, although not available to plaintiff to prove ordinary negligence, were relevant to the question of whether the City had constructive notice of a dangerous condition. It is settled that "[c]onstructive notice may be imputed if it can be shown that an obvious danger existed for a sufficient period of time before the accident to have permitted [the public entity's] employees, in the exercise of due care, to discover and remedy the situation." (*Briggs v. State of California* (1971) 14 Cal.App.3d 489, 494-495 [92 Cal.Rptr. 433].) Government Code section 835.2, accordingly, expressly recognizes that in determining whether a public entity has constructive notice of a dangerous condition, the jury may consider whether "the condition and its dangerous character would have been discovered by an inspection system that was reasonably adequate . . . to inform the public entity whether the property was safe for [its intended use]" and "[w]hether the public entity maintained and operated such an inspection system with due care and did not discover the condition."

That the City maintained a system for the purposes of finding and repairing defects such as the pothole, was relevant to the question of whether the pothole should have been noticed before plaintiff's accident occurred. Plaintiff, therefore, was entitled to elicit evidence that City employees in fact inspected the track system for defects such as the pothole. In addition, plaintiff was entitled to elicit evidence that City employees could have repaired the pothole prior to plaintiff's injury, because she was required to show that the City had actual or constructive knowledge of the dangerous condition a sufficient time prior to the injury to have taken measures to protect against it. Finally, as the City can act only through its employees, it was proper to instruct the jury that the City was responsible for what an employee should have noticed, or could have done.

Moreover, any error was harmless. The jury was given a special verdict form that directed it to determine the issues necessary to a finding of liability on a theory of dangerous condition of property. The jury therefore was asked to decide if a dangerous condition existed, if the dangerous condition was a cause of plaintiff's injury, if it created a foreseeable risk of the kind of injury suffered by plaintiff, and if the City had actual or constructive notice of the dangerous condition a sufficient time prior to the injury to have taken measures to protect against the dangerous condition. The jury was *not* asked to determine whether the City was negligent, although, again, it properly was required to decide if the City could have taken measures to protect against the dangerous condition. The City claims it suffered undue prejudice because it might be inferred that the pothole presented a dangerous condition simply because the witnesses testified that they would or should have repaired it. The jury, however, was made aware that the City repaired potholes whether or not an employee felt that they presented a dangerous condition. Finally, given the extent of the plaintiff's injuries, once it was determined that plaintiff fell because of an unrepaired two-foot-long, three-inch-deep pothole, there was little question but that the pothole presented a dangerous condition.

## II.

### *The City's Claims of Attorney Misconduct*

The City complains that plaintiff's counsel was permitted, over defense objection, to exhort the jury to "send a message" to the City. Counsel asserted that the jurors should hold the City "accountable," and "responsible for doing its job," by "delivering a substantial verdict." He argued (without defense objection) that "there is a constitutional amendment that says we are all suppose[d] to be free from unusual, cruel and unusual punishment. So if someone was to torture someone, everyone would agree that is a crime, that is something you cannot do in our society. So what do you do to try to say what is it worth to compensate someone for pain?" Counsel also told the jurors, during rebuttal, that they could make a statement by compensating the plaintiff, and by "your verdict you do decide how our City should be run," and "how the City should do its job, how we as citizens deserve to be treated." He argued that the City apparently believed it was better to allow someone to be hurt than to require City employees to do their jobs, alluding to *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757 [174 Cal.Rptr. 348].

The City also complains that plaintiff's counsel was permitted to make an improper "golden rule" argument, by asserting that no one would choose to

trade places with the plaintiff and that the City was gambling with the safety of all of its citizens, and by suggesting that the accident could have involved "our families, our children," and that "one of our own has been mistreated, has been shabbily treated."

A "golden rule" argument indicates to the jury that it would be proper in calculating damages to place themselves in the plaintiff's shoes and award the amount they would "charge" to undergo equivalent disability, pain and suffering. (*Brokopp v. Ford Motor Co.* (1977) 71 Cal.App.3d 841 [139 Cal.Rptr. 888, 93 A.L.R.3d 537].) We see no evidence of such an argument here. Nonetheless, some of counsel's argument bordered on the improper. Counsel is granted wide latitude to discuss the merits of the case, both as to the law and facts, and is entitled to argue his or her case vigorously and to argue all reasonable inferences from the evidence. (*Grimshaw v. Ford Motor Co., supra,* 119 Cal.App.3d at pp. 798-799.) Any suggestion that the jury should "send a message" by inflating its award of damages, however, would be improper where, as here, punitive damages may not be awarded. Similarly, the use of terms such as "torture," or the suggestion that the City chose to risk harm to its citizens rather than to cause its employees to do their jobs, tended to deflect the jury from their task, which was to render a verdict based solely on the evidence admitted at trial. (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1246 [1 Cal.Rptr.2d 301], citing *Neumann v. Bishop* (1976) 59 Cal.App.3d 451, 484-485 [130 Cal.Rptr. 786].) The same is true for arguments aligning the plaintiff with "our families, our children," and implying that the City had taken action against "one of our own."

Counsel's comments, however, even if improper, do not warrant reversal. ■ "The ultimate determination of this issue rests upon this court's 'view of the overall record, taking into account such factors, inter alia, as the nature and seriousness of the remarks and misconduct, the general atmosphere, including the judge's control, of the trial, the likelihood of prejudicing the jury, and the efficacy of objection or admonition under all the circumstances.'" (*Simmons v. Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341, 351 [133 Cal.Rptr. 42], quoting from *Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 321 [74 Cal.Rptr. 534, 449 P.2d 750].) And, because of the trial court's unique ability to determine whether a verdict resulted in whole or in part from the alleged misconduct, its decision to deny a motion for new trial should not be disturbed unless plainly wrong. (*Houser v. Bozwell* (1947) 80 Cal.App.2d 702, 707 [182 P.2d 314].)

■ Here, in the context of the case as a whole, and of the parties' arguments, counsel's comments were not particularly egregious. The suggestion that the jury should send a message to the City through its award of

damages was, in context, less a plea for punitive damages than a plea for a verdict of liability. The "message" simply was that the City should be held liable for failing to repair noticeable dangerous conditions. This certainly was not a case such as *Stafford v. United Farm Workers* (1983) 33 Cal.3d 319 [188 Cal.Rptr. 600, 656 P.2d 564], cited by the City, where an erroneous evidentiary ruling allowed the plaintiff to put irrelevant but inflammatory evidence before the jury that the defendant was subject to a temporary restraining order, and then to argue that the jury should "send a message" to the defendant that restraining orders cannot be violated with impunity. And although it may have been improper to refer to the jurors' families and children, there is no likelihood that these references had any effect on the verdict.

The trial court had no discretion to grant a new trial in the absence of prejudicial error. (*Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152, 1161 [79 Cal.Rptr.2d 641].) As any error here was harmless, the trial court's ruling was correct.

### III.

#### *Award of Plaintiff's Medical Expenses*

A plaintiff in a personal injury action is entitled to recover from the defendant tortfeasor, the reasonable value of medical services rendered to the plaintiff, including the amount paid by a collateral source, such as an insurer. As medical expenses fall into the category of economic damages, they represent actual pecuniary loss caused by the defendant's wrong. (Civ. Code, § 1431.2, subd. (b)(1); *Hanif v. Housing Authority* (1988) 200 Cal.App.3d 635, 641 [246 Cal.Rptr. 192].) "Thus, when the evidence shows a sum certain to have been paid or incurred for past medical care and services, whether by the plaintiff or by an independent source, that sum certain is the most the plaintiff may recover for that care despite the fact that it may have been less than the prevailing market rate." (*Hanif v. Housing Authority, supra,* 200 Cal.App.3d at p. 641.)

The jury awarded plaintiff $20,295 for the costs of her medical care, which included the sum of $17,168 for care received by her from California Pacific Medical Center (CPMC). This amount was based on CPMC's normal rates. Plaintiff, however, participates in an employer-sponsored health plan administered by Blue Cross. At the time of plaintiff's care, Blue Cross had a contract with CPMC under which CPMC agreed that Blue Cross would pay reduced rates for specified services rendered to members, and CPMC would accept Blue Cross's payment as payment in full for those services. Under the

terms of that agreement CPMC accepted $3,600 as payment in full for the services it rendered to plaintiff. The City concedes its responsibility to pay plaintiff the $3,600 paid to CPMC by Blue Cross. It complains, however, that the court permitted the jury to award damages for medical costs based on CPMC's normal rates, rather than the sum it actually accepted from Blue Cross.

Plaintiff did not and does not contest the assertion that CPMC accepted $3,600 as payment in full for the services provided. She points out, however, that in accordance with California's Hospital Lien Act (HLA), Civil Code sections 3045.1-3045.6, CMPC filed a lien against the judgment reflecting its normal rates, and argues that she should not be put in the position of having to accept the lesser amount in this action while risking the possibility that she will then have to pay a greater amount to CPMC because of its lien.

We find that CPMC's lien rights do not extend beyond the amount it agreed to receive from Blue Cross as payment in full for services provided to plaintiff. As CPMC has been paid that amount, it has no lien rights in the damages awarded to plaintiff, and the court, therefore, erred in permitting the jury to award plaintiff an amount in excess of $3,600 for the services provided by CPMC.

Civil Code section 3045.1 provides, in relevant part, that any designated hospital that has provided medical service "to any person injured by reason of an accident or negligent or other wrongful act . . . shall, if the person has a claim against another for damages on account of his or her injuries, have a lien upon the damages recovered, or to be recovered, by the person . . . to the extent of the amount of the reasonable and necessary charges of the hospital . . . in which services are provided for the treatment, care, and maintenance of the person in the hospital . . . resulting from that accident or negligent or other wrongful act." Plaintiff's position is that the HLA creates an independent right in the health care provider to seek payment for its services from third parties, noting that the statutory scheme recognizes a direct right of action against third parties who have failed to recognize the lien rights of the hospital and have paid the injured person. (Civ. Code, §§ 3045.4, 3045.5; *Mercy Hospital & Medical Center v. Farmers Ins. Group of Companies* (1997) 15 Cal.4th 213, 219 [61 Cal.Rptr.2d 638, 932 P.2d 210].) It follows, in plaintiff's opinion, that the phrase "reasonable and necessary charges" in Civil Code section 3045.1, need not be tied to the amount actually charged to the injured person, but can be interpreted to mean the hospital's customary rates. We disagree.

Even if the HLA contemplated an independent right in the hospital, the extent of that right would be defined by any contract between the injured

party or her insurer and the health care provider. Civil Code section 3045.4 accordingly provides that the third party "shall be liable to the [health care provider] for the amount of its lien claimed in the notice *which the hospital was entitled to receive as payment* for the medical care and services rendered to the injured person." (Italics added.) The amount that a hospital is entitled to receive as payment necessarily turns on any agreement it has with the injured person or the injured person's insurer. Here, for example, because of its contract with Blue Cross, CPMC was entitled to receive only $3,600 as payment for the medical services rendered to plaintiff.

Moreover, we conclude, contrary to plaintiff's contention, that any claim by a health care provider is not independent of, but derives from, the claim of the injured person.

No state court has addressed the precise question at issue here, but persuasive authority for this conclusion exists in the federal district case of *Grauberger v. St. Francis Hospital* (N.D.Cal. 2001) 149 F.Supp.2d 1186. The plaintiff in *Grauberger* was injured in an automobile accident, and was treated for those injuries at St. Francis hospital. She was insured by Blue Cross, which paid the hospital its negotiated rates. The hospital filed a lien in an action brought by the plaintiff against the defendant driver, seeking the amount of its normal rates. The hospital contended that the HLA conferred an independent right on it to recover payment from the tortfeasor for treatment rendered to the plaintiff. The district court disagreed. "First, the language of the HLA does not give hospitals a *cause of action;* it only allows hospitals to place a *lien* on the *patient's* cause of action. And the lien is for the amount of the 'reasonable and necessary *charges*' flowing from treatment of the injuries suffered by plaintiff. [Citation.] Those 'charges' are necessarily the charges made *to the patient* or her health care insurer. In the absence of a right to be paid for such charges, the Hospital has no 'amount,' reasonable or otherwise, to seek from a third-party judgment, settlement or compromise. The debt owed by plaintiff to the Hospital is the foundation for the Hospital's lien right." (*Id.* at p. 1191.)

That the hospital's right to payment is derivative also was recognized, albeit in another context, by our Supreme Court in *Mercy Hospital & Medical Center v. Farmers Ins. Group of Companies, supra,* 15 Cal.4th 213. The tortfeasor's insurance company in that case paid the injured person without recognizing a hospital's lien rights. The hospital filed suit against the insurer, seeking the full value of its medical services, notwithstanding that this amount exceeded the policy limits of the tortfeasor's policy with the insurer, and thus exceeded the amount that the injured party was entitled to receive from the insurer. The Supreme Court held that the hospital's lien

rights against the tortfeasor's insurer depended on the amount the injured party was entitled to recover from the insurer, thus finding that hospital's rights were not independent, but derivative of, the rights of the injured person.

It is true, as plaintiff points out, that because CPMC is not a party to this action it is not bound to any ruling made concerning its lien rights. We do not see, however, that plaintiff bore or bears the risk that those rights might be misconstrued. The HLA places the burden of satisfying the hospital's lien on the defendant tortfeasor, not on the plaintiff. If, therefore, a ruling is wrong, and the defendant therefore fails to pay the hospital the proper amount at the time of judgment, Civil Code sections 3045.4 and 3045.5 permit the hospital to seek recourse against the tortfeasor, but there is no authority permitting the hospital to seek recourse from the plaintiff.

We therefore conclude that the trial court erred in permitting the jury to award plaintiff $17,168 instead of $3,600 for CPMC's services. We do not agree with the City, however, that this error requires remand, because the jury somehow received a false impression of the extent of plaintiff's injuries by learning the usual rates charged to treat those injuries. There is no reason to assume that the usual rates provided a less accurate indicator of the extent of plaintiff's injuries than did the specially negotiated rates obtained by Blue Cross. Indeed, the opposite is more likely to be true. We therefore will simply modify the judgment to reduce the amount awarded as costs for medical care.

## CONCLUSION

The judgment is modified by reducing the award of costs for medical care from $20,295 to $6,727, thereby reducing the total award of damages to $85,496. As so modified, the judgment is affirmed.

Each party will bear its own costs on appeal.

Swager, J., and Marchiano, J., concurred.