[No. A134089. First Dist., Div. Five. Apr. 8, 2013.]

JAMES LUTTRELL, Plaintiff and Appellant, v.
ISLAND PACIFIC SUPERMARKETS, INC., Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II., first paragraph, II.A., II.B., and II.D. through II.F.

COUNSEL

Howard R. Melamed for Plaintiff and Appellant.

McNamara, Ney, Beatty, Slattery, Borges & Ambacher, Wilma J. Gray and Christopher T. Lustig for Defendant and Respondent.

## OPINION

**NEEDHAM, J.**—James Luttrell (Luttrell) appeals from an amended judgment entered after a jury verdict and posttrial rulings in his personal injury action. He contends (1) substantial evidence did not support the jury's finding that he was 5 percent comparatively negligent in regard to a hip fracture he sustained at respondent's premises; (2) substantial evidence did not support the court's ruling that Luttrell's recovery should be reduced by 50 percent, for failure to mitigate his damages, with respect to medical expenses attributable to a decubitus ulcer he developed after his hip fracture; (3) the court should have applied this 50 percent reduction to the amount of medical expenses billed for the ulcer, rather than the amount of medical expenses paid, notwithstanding the holding in *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541 [129 Cal.Rptr.3d 325, 257 P.3d 1130] (*Howell*); (4) even if Luttrell's damages were properly reduced under *Howell*, the amount of a Medicare lien should have been added to the judgment; (5) the court erred in reducing the judgment by $10,000 for a payment Luttrell received under respondent's no-fault medical expense insurance, or the $10,000 should be added to the amount paid in determining the amount of the judgment; and (6) substantial evidence does not support the jury's award for past and future pain and suffering.

In the published portion of our opinion, we conclude that the trial court properly applied *Howell*, and specifically that *Howell* governs where past medical expenses have been paid by Medicare, and the *Howell* cap should be imposed before any reduction for failure to mitigate damages. In the unpublished portion of our opinion, we conclude that the remainder of Luttrell's arguments lack merit. We therefore affirm the judgment.

## I. FACTS AND PROCEDURAL HISTORY

In June 2009, appellant Luttrell fractured his left hip when an automatic door repeatedly hit him as he struggled to leave the premises owned by respondent Island Pacific Supermarkets, Inc. (Island Pacific). Luttrell received treatment and care at Washington Hospital and Park Central Care & Rehabilitation Center (Park Central) until he was discharged in July 2009. In August 2009, Luttrell sued Island Pacific for failing to maintain the automatic door.

In October 2009, while the lawsuit was pending, Luttrell was admitted to St. Rose Hospital (St. Rose) for treatment of a bedsore that was later

diagnosed as a decubitus ulcer. Luttrell received treatment and care at St. Rose and Danville Rehabilitation until he was discharged on March 31, 2010. Luttrell's lawsuit ultimately sought damages, including past medical expenses, for both his fractured hip and his decubitus ulcer.

In November 2010, Island Pacific's insurer issued a $10,000 check payable to Luttrell, his attorney, and Medicare, under Island Pacific's "no-fault" medical payments coverage. The check was cashed, and Luttrell in return signed an indemnity and hold harmless agreement.

In January 2011, Island Pacific served Luttrell with an offer to compromise for $600,000 under Code of Civil Procedure section 998 (998 offer).

For treatment of his fractured hip and decubitus ulcer, Luttrell's medical providers billed $690,548.93 ($179,443.72 for the hip and $511,105.21 for the ulcer), but settled these bills with Medicare (and Medi-Cal) for $138,082.25. Based on *Hanif v. Housing Authority* (1988) 200 Cal.App.3d 635 [246 Cal.Rptr. 192] (*Hanif*)—which held that a plaintiff's recovery for the value of past medical services was limited to the amount actually paid— Island Pacific moved in limine to exclude references to Luttrell's billed medical expenses that had not been paid. With the parties' agreement, the court denied the motion without prejudice to Island Pacific raising the issue after trial if necessary.

The matter proceeded to a jury trial.

A. *Trial*

We set forth the trial evidence to the extent relevant to this appeal.

1. *Luttrell's Account of the Incident*

In June 2009, Luttrell was 67 years old and had been on disability since his 50's. As a result of spinal issues, he had problems with his right leg and foot, for which he wore special shoes and was prescribed an ankle/foot orthotic brace for stability. His right leg was weak, and he had little flexion in his right foot. He used a cane or two for balance. Although he had been prescribed a walker, he refused to use it. A medical record indicated that he was "chair-fast" (meaning "he gets up in the chair but doesn't ambulate much") and his mobility was "slightly impaired."

On June 15, 2009, Luttrell parked his car outside the Island Pacific Supermarket. As he entered the market and proceeded through the shopping

mall, he used one cane to help him walk and carried a second cane in his other hand. He was not using a walker or wearing his ankle/foot brace.

Luttrell made his way to a travel agency; when he learned the travel agent he wanted to see was not there, he proceeded back toward the exit.

As Luttrell approached the exit, the automated doors began to open. Still using his cane in his left hand and carrying the other cane in his right, he entered the threshold at a normal pace. As he was passing over the threshold, however, the doors began to close. He continued to "struggl[e] to get out the doors" by pushing himself out, and the doors hit him "at least three or four times." After he made it through the doors, he fell to the ground because his legs had "twisted," and he was unable to get up. There were no witnesses to the event.[1]

### 2. Treatment of Luttrell's Fractured Hip

Luttrell was taken by ambulance to Washington Hospital, where he was diagnosed with a fractured hip and underwent surgery.

Later that month, Luttrell was transferred to Park Central for physical therapy. Upon his discharge on July 25, 2009, the Park Central staff recommended that he perform various exercises at home, including walking, hand-weight exercises, and leg exercises. The staff encouraged him to walk every day and advised him that the exercise would help him recover from his hip surgery.

Luttrell testified, however, that he did not perform the leg exercises; he "tried" to walk with assistance and did weight training with mainly two-pound weights "as much as [he] could."

### 3. Luttrell's Decubitus Ulcer

In October 2009, Luttrell was admitted to St. Rose for what was later diagnosed as a stage IV ischial decubitus ulcer. "Ischial" refers to a person's buttocks; ischial decubitus ulcers are classified by stage, from stage I through stage IV, with stage IV being the most severe.

After a course of antibiotics, Luttrell's St. Rose doctor referred him to Danville Rehabilitation and then to Dr. Daniel B. Allen for further treatment.

---

[1] Two days later, a technician determined that the doors' sensor had malfunctioned due to a short circuit. Although the technician estimated that the condition had existed for three to seven days, no customer had complained to Island Pacific about the doors, and a store employee who tested the doors on the morning of the incident estimated that the doors remained open for five seconds.

Dr. Allen first saw Luttrell in January 2010 and admitted him to St. Rose in February 2010 for surgery to repair the ulcer. Luttrell was discharged from St. Rose on March 31, 2010.

### a. *Dr. Allen's testimony*

Dr. Allen testified that the root cause of a decubitus ulcer is pressure; pressure sores are suffered by people who cannot feel their buttocks and older people who have major medical catastrophes or major orthopedic injuries, which would include a hip fracture.

According to Dr. Allen, Luttrell was predisposed to developing a decubitus ulcer even before he fractured his hip, because of neurological or sensory loss he suffered from an earlier excision of a tumor and other treatment. Dr. Allen opined it was "extremely unlikely" that Luttrell would have developed a stage IV decubitus ulcer if he not had the hip fracture, however, because Luttrell was ambulatory before the hip fracture and "ambulatory patients rarely develop stage IV decubitus ulcers."

Luttrell told Dr. Allen that, after being discharged from Park Central, he spent a large part of his day lying down and a large part of his day sitting down. Dr. Allen opined that, to avoid a pressure sore, he needed to "be on a special cushion; he needed to be up only two hours at a time; he needed to be transferring back and forth between the bed and the wheelchair and the special cushion." In Dr. Allen's view, the fact that Luttrell developed a stage IV ischial decubitus ulcer was evidence he had not done these things.

Dr. Allen testified that Luttrell could not remember their discussions from day to day, could not remember to do what he was told to do, and was unable to cooperate with nurses in positioning to avoid pressure to the wound.[2] Although Dr. Allen understood that Luttrell was given a regimen of home exercises to perform after being discharged from Park Central, he did not believe a patient's failure to do home exercises would itself be a factor in causing a decubitus ulcer, because pressure is what determines whether the ulcer is going to develop.

### b. *Dr. Kannan's testimony*

Dr. Nirmala Kannan, the physician who treated Luttrell upon his admission to St. Rose in October 2009, testified that Luttrell needed help turning (in

---

[2] Dr. Allen also testified that Luttrell failed to follow his medical advice. After his February 2010 surgery for the decubitus ulcer, Dr. Allen gave Luttrell instructions to sit only on a "Rojo cushion." When Dr. Allen saw Luttrell in December 2010, he was concerned that Luttrell was developing another decubitus ulcer, possibly from failing to use the Rojo cushion on a 12-hour flight to the Philippines. Dr. Allen counseled Luttrell not to sit up at all for a month, but at a subsequent visit Luttrell said that he was sitting up twice daily, two hours at a time.

bed) and was unable to get out of bed by himself. Luttrell's muscles had no tone, they were not strong enough for him to stand or to do any activities by himself, and he could not walk to the bathroom without aid. Dr. Kannan opined that Luttrell's weakness and deconditioning had existed for over two or three months.

### c. Dr. Stearns's testimony

Dr. William Stearns, who treated Luttrell for his fractured hip at Washington Hospital, testified that a recognized complication from a fractured hip includes pressure sores due to the immobilization that the fractured hip causes. If Luttrell had not fractured his hip, Dr. Stearns opined, he would not have developed his pressure sore; the decubitus ulcer was caused 90 percent by Luttrell's hip fracture because the fracture led to his deconditioning. Indeed, when Stearns saw Luttrell on December 15, 2010, Luttrell was struggling to walk, largely due to muscle weakness. In response to a jury question, however, Dr. Stearns testified that while stage I and stage II ulcers are common among older patients after orthopedic surgery for a hip fracture, stage IV ulcers are not.

### d. Dr. Kawaguchi's testimony

Dr. Alan Kawaguchi, an expert witness presented by the defense, testified that the primary reason for Luttrell's decubitus ulcer was his preexisting spinal tumor, which decreased sensation in his buttocks area. Luttrell was at high risk of developing a decubitus ulcer after breaking his hip, particularly if he failed to take care of himself, since he had developed a decubitus ulcer before he broke his hip. Luttrell's muscle weakness and lack of muscle tone, a product of his broken hip, possibly contributed to his inability to turn himself in bed. His hip fracture was a substantial factor in causing the ulcer, and he would not have developed the ulcer if he had not fractured his hip. On the other hand, medical records did not indicate that Luttrell was developing an ulcer at Washington Hospital or Park Central.

Dr. Kawaguchi testified that it was important for patients to perform exercises to rehabilitate and regain their strength, and Luttrell had been given exercises to perform when he was discharged from Park Central. He testified that it is "sitting in one position" that causes the ischial ulcer, and the patient must change positions to prevent the ulcer from developing.

### 4. Exhibit 19 Indicating Amounts Billed

By stipulation of the parties, the court admitted into evidence an exhibit (trial exhibit 19) that listed Luttrell's past medical expenses for his fractured

hip and decubitus ulcer. The exhibit itemized the amounts billed by each of Luttrell's health care providers, totaling $179,443.72 for the fractured hip and $511,105.21 for the ulcer, for a grand total of $690,548.93.

The case was submitted to the jury with a four-page verdict form, which included questions asking whether Luttrell was negligent and, if so, whether his negligence was a substantial factor in causing his harm. The jury had also been instructed on the limitations on liability for a preexisting condition and Luttrell's duty to mitigate his damages. (See CACI Nos. 3927, 3930.)

### 5. *Jury's Verdict and Initial Judgment*

The jury returned a verdict finding Island Pacific negligent (95 percent) and Luttrell contributorily negligent (5 percent). The jury found that Luttrell's damages for past medical expenses totaled $256,109.50, comprised of $179,443.72 for treatment of his fractured hip (100 percent of the $179,443.72 billed), plus $76,665.78 for treatment of his decubitus ulcer (just *15 percent* of the $511,105.21 billed, apparently on the basis that Luttrell had a preexisting condition). The jury also awarded Luttrell $116,664.50 for future medical expenses, $30,000 for past noneconomic loss including pain and suffering, and $10,000 for future noneconomic loss including pain and suffering, bringing the total jury award to $412,774.00.

Because the jury found Luttrell 5 percent comparatively negligent, the jury's verdict was reduced by 5 percent to $392,135.30. Judgment in that amount was entered on May 20, 2011.

### B. *Posttrial Motions*

After the jury verdict, Island Pacific moved to reduce the damages awarded for past medical expenses to the amount that the parties had stipulated was actually paid on those expenses by Medicare ($138,082.25), pursuant to *Hanif, supra*, 200 Cal.App.3d 635. (*Howell* was pending in the Cal. Supreme Court when the motion was filed and was decided before the motion was heard.) Island Pacific also requested a $10,000 offset for the November 2010 payment Island Pacific's insurer had made to Luttrell and Medicare pursuant to its policy's medical payments provision.

Luttrell moved for a new trial, in part on the ground that the damages awarded for his past medical expenses were inadequate—specifically, that the jury should not have awarded him only 15 percent of the claimed expenses associated with the treatment of his decubitus ulcer. (Code Civ. Proc., § 657, subd. 5.)

On October 31, 2011, the court heard the parties' posttrial motions. At the hearing, Luttrell challenged for the first time the adequacy of the jury's award of noneconomic damages as well.

In its written order dated November 3, 2011, the court granted Island Pacific's motion to reduce the past medical damages to the amount actually paid. The court also granted Luttrell's motion for a new trial in part, finding that the jury had improperly reduced the award as to his decubitus ulcer to 15 percent under CACI No. 3927 (aggravation of preexisting condition or disability) and CACI No. 3928 (unusually susceptible plaintiff). However, the court concluded that the evidence supported a reduction to 50 percent, based on Luttrell's failure to mitigate his damages, and then reduced the amounts paid for treatment of his decubitus ulcer by that 50 percent.[3] The court rejected Luttrell's challenge to the adequacy of the jury's award for noneconomic damages, noting that he had not raised the issue in his new trial motion. The court further agreed that Luttrell's recovery should be reduced by the $10,000 he was paid by Island Pacific's insurance carrier.

With these adjustments, along with a 5 percent reduction for Luttrell's contributory negligence and cost awards taking into consideration Luttrell's failure to recover more than Island Pacific's 998 offer, the court entered an amended judgment in the net sum of $207,057.31.

Luttrell filed a notice of appeal from the judgment and from the amended judgment.

## II.  DISCUSSION[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[3] The court stated: "Plaintiff's prior decubitus ulcer condition was not a pre-existing condition for which the jury should have apportioned damages by applying CACI 3927. Rather the record reflects that Plaintiff's pre-accident ulcer condition had healed and that history made him more susceptible to developing another one as a result of breaking his hip in the accident. Under CACI 3928[,] Defendant is responsible for conditions developed by a particularly susceptible plaintiff, and it was improper to reduce damages by way of a CACI 3927 analysis. Construing the evidence most favorably in support of the jury's verdict, one could conclude some discount to be appropriate on a mitigation of damages basis. The Court concludes that at most this would support a 50 [percent] factor; however, *Howell* would still limit the maximum recovery to the amounts paid." The net of the court's rulings meant that, instead of Luttrell recovering $76,665.78 for past medical expenses for his decubitus ulcer (at 15 percent of the amounts billed), he recovered $43,866.89 (at 50 percent of the amounts paid). Thus, he ended up receiving less than the jury awarded, even though the court agreed that the jury reduced the award improperly; but the end result was because the relevant amounts of medical expenses were the amounts paid, not the amounts billed.

[*] See footnote, *ante*, page 196.

A., B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### C.  *Application of 50 Percent Mitigation to Amounts Paid*—Howell

After deciding that Luttrell's recovery for the past medical expenses attributed to his decubitus ulcer should be reduced by 50 percent on mitigation grounds, and agreeing that *Howell* limited Luttrell's recovery to the amounts paid for those medical expenses rather than the amounts billed, the court applied the 50 percent reduction to the amounts paid with respect to Luttrell's decubitus ulcer. The result was that Luttrell recovered 50 percent of the amounts his medical providers had agreed to accept from Medicare as full payment for the medical expenses associated with the ulcer. Luttrell contends the court should have applied the 50 percent reduction to the "amounts billed" rather than the "amounts paid."[4]

#### 1.  *Does* Howell *Apply*

The primary thrust of Luttrell's theory in this regard is that the *Howell* rule—limiting recovery to the amounts paid for past medical expenses rather than the amounts billed—should not be applied to this case at all. But it plainly must.

■    As a general rule, a plaintiff in a tort action is not to be placed in a better position than he would have been in if the wrong had not been done. (*Valdez v. Taylor Automobile Co.* (1954) 129 Cal.App.2d 810, 821–822 [278 P.2d 91].) Thus, a plaintiff typically may not recover more than the actual amounts paid by him or on his behalf for past medical services, even though the amounts billed for those services were greater. (*Howell, supra*, 52 Cal.4th at pp. 555, 566 [plaintiff may recover as economic damages the lesser of the reasonable value of the medical services received and the amount paid by the plaintiff or private insurance on the plaintiff's behalf, not the amount billed]; *Hanif, supra*, 200 Cal.App.3d at pp. 639–644 [plaintiff's recovery should have been limited to amount Medi-Cal paid medical providers on plaintiff's behalf, even if substantially lower than the reasonable value of the treatment, because the plaintiff's detriment and pecuniary loss were only what

---

* See footnote, *ante*, page 196.

[4] Luttrell contends that application of the 50 percent reduction to the amounts billed would have given him a jury verdict of $255,552.60 for past medical expenses, which would have resulted in a total jury award of $668,326.60, exceeding Island Pacific's 998 offer of $600,000. And, with an award in excess of Island Pacific's 998 offer, he claims his recovery would not have been reduced by $26,841.60 for Island Pacific's costs under Code of Civil Procedure section 998, subdivision (c)(1).

Medi-Cal paid]; *Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298, 306 [112 Cal.Rptr.2d 861] [plaintiff could recover only amounts paid to medical providers on his behalf by private insurer]; *Sanchez v. Brooke* (2012) 204 Cal.App.4th 126, 131, 142 [138 Cal.Rptr.3d 507] [injured employee's recovery limited to amounts paid to medical providers by employer under workers' compensation law, where employee not liable for balance of billed amounts].)

Here, Medicare and Medi-Cal had preexisting contractual relationships with Luttrell's medical providers, by which the providers agreed to accept a sum less than their usual and customary charges as payment in full for their services. Those providers may not seek reimbursement over the amounts that Medicare and Medi-Cal were contractually obligated to pay. (See *Parnell v. Adventist Health System/West* (2005) 35 Cal.4th 595, 609 [26 Cal.Rptr.3d 569, 109 P.3d 69].) Because Luttrell's liability to medical providers for their past medical services is limited to the amounts Medicare and Medi-Cal actually paid, Luttrell's recovery from Island Pacific for past medical services must be limited to those amounts actually paid. (*Howell, supra,* 52 Cal.4th at p. 567.)

Luttrell contends in his appellate briefs (but retreated from his position during oral argument) that the *Howell* rule is nonetheless inapplicable because *Howell,* involving payments by the plaintiff's private insurance, did not discuss how its holding would apply if the medical expenses were instead paid by Medicare. He argues that, as of the date of his reply brief (filed on Dec. 5, 2012), there was no published opinion in California holding that *Hanif* or *Howell* "apply where the medical payments come from Medicare as happened in the instant case." However, Luttrell fails to articulate any reason why *Howell* should *not* apply when Medicare makes the payments, ignores the fact that *Hanif* involved a Medi-Cal recipient rather than a private insurer, and does not account for the fact that, whatever the *source* of the payments— private insurer or Medicare—the end result is the same: Luttrell has no liability for past medical services in excess of those payments, so he is not entitled to recover anything more than the payment amount. (See *Howell, supra,* 52 Cal.4th at p. 557; see also *Sanchez v. Strickland* (2011) 200 Cal.App.4th 758, 760 [133 Cal.Rptr.3d 342] [noting in the published portion of the opinion that it was concluding, in the unpublished portion of its opinion, that *Howell* applies to Medicare payments].)

Luttrell also refers us to *Katiuzhinsky v. Perry* (2007) 152 Cal.App.4th 1288 [62 Cal.Rptr.3d 309] (*Katiuzhinsky*), but that case is clearly inapposite. In *Katiuzhinsky,* the injured plaintiffs' medical providers secured a lien in the full amount of the bills against any recovery in the plaintiffs' personal injury actions. Then, instead of settling their bills with an insurer, some of the providers sold their bills at a discount to a third party financial services

company. (*Id.* at p. 1291.) The medical providers wrote off the balance, but the plaintiffs remained liable to the finance company for the original *full* amount of the bills. (*Ibid.*; see *Howell, supra,* 52 Cal.4th at pp. 554–555.) The court in *Katiuzhinsky* held that *Hanif* did not apply under those circumstances: because the plaintiffs *remained liable for the full amount billed* by the medical providers, limiting the plaintiffs' recovery from the tortfeasor to the discounted rate paid by the third party that bought the lien from the providers would place the plaintiffs in a worse position than if the tort had not been committed, thus undercompensating the plaintiffs and giving the tortfeasor a windfall. (*Katiuzhinsky,* at p. 1296.) Here, by contrast, Luttrell not only has no liability to the medical providers, his only liability for his past medical expenses is represented by the Medicare lien equal to the amount actually paid on his behalf. Luttrell has not provided any evidence that he remains liable to any of his medical providers (or any financial services company) for any amount.

Luttrell further argues: "[I]f his judgment for past medical expenses is reduced to the actual amount paid by Medicare ($138,082.25) and he is required to satisfy Medicare's lien for that same amount, he will not have recovered the actual amount paid for past medical care as is his right under *Hanif.* Rather, he will receive zero for past medical expenses. If he receives zero, it is axiomatic that he has not been compensated for his damages in the form of past medical expenses." But this argument is a non sequitur. Medicare *paid* his medical expenses; his *only* purported liability for the medical services is the Medicare lien. With his recovery limited to the amount Medicare paid, he receives enough to pay off the lien and ends up financially whole for his past medical expenses (except, of course, to the extent he failed to mitigate his damages, a separate issue we address next).

### 2. *Should the Mitigation Reduction Be Applied to Amounts Paid*

In arguing whether the court should have applied the 50 percent reduction to the amounts paid or to the amounts billed, the parties focus on whether *Howell* is germane to this case at all. A subtler question—skirted by the parties in their briefs but implicated by their arguments (and addressed at oral argument at our invitation)—pertains to the *order* in which the *Howell* cap and the mitigation reduction should be applied: should the court first apply the mitigation reduction to the amounts billed, and then impose *Howell*'s amounts-paid cap, or should the court impose the amounts-paid cap first, with the mitigation reduction then applied to that amount?[5] In our view, it is clear

---

[5] Luttrell hints at this issue in his appellate briefs. Without elaboration or support, he argues: "There is no logical reason to apply the 50 [percent] factor to the amounts paid as opposed to the amounts billed." Further, he asserts, a "correct application of the 50 percent factor would

that the *Howell* cap must be applied first, since the amount actually paid on the plaintiff's behalf represents the *maximum* amount a plaintiff could recover.

■ The amounts-paid cap is the highest amount of damages the plaintiff may recover for past medical expenses. (*Howell, supra*, 52 Cal.4th at pp. 555–556.) Indeed, the amount of billed-but-*un*paid medical expenses is generally not even admissible at trial on this issue. (*Id.* at p. 567 [where provider has accepted less than a billed amount as payment as full, "evidence of the full billed amount is not itself relevant on the issue of past medical expenses"].)

Furthermore, the point of the *Hanif-Howell* line of cases is that the tortfeasor should be held to pay the full cost of its negligence or wrongdoing—no more and no less. (*Howell, supra*, 52 Cal.4th at pp. 560, 566.) This can be accomplished if the maximum potential recovery is first ascertained by reference to the amounts actually paid for medical expenses and then reducing them by the percentage attributable to the plaintiff's contribution to that expense. It will not be accomplished in some instances, however, by first applying the mitigation reduction to the billed amounts, and then imposing the amounts-paid cap. The facts of the matter before us bear this out.

■ The amounts billed by St. Rose, Danville Rehabilitation, Dr. Kannan, and Dr. Allen with respect to Luttrell's decubitus ulcer totaled $511,105.21; the amounts paid to those providers (by Medicare/Medi-Cal) totaled $87,733.76; applying the 50 percent mitigation reduction to the amounts paid to each of those providers, the total awarded to Luttrell as past medical expenses for his decubitus ulcer was $43,866.89. If the 50 percent reduction had instead been taken first from the amounts billed (reducing the $511,105.21 award to $255,552.60), and *then* the court applied the *Howell* cap equal to the amounts paid ($87,733.76), Luttrell would have recovered the entire amount paid ($87,733.76), and his failure to mitigate would have had no consequence whatsoever. The result would have provided a windfall to Luttrell and imposed liability upon Island Pacific in excess of the damage it caused.

The trial court did not err in reducing the amounts paid for Luttrell's decubitus ulcer by 50 percent.

D.–F.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

have given Luttrell a jury verdict of $255,552.60 for past medical expenses (subject to a reduction, if any, based on *Howell*)."

* See footnote, *ante*, page 196.

### III.   DISPOSITION

The judgment is affirmed.

Jones, P. J., and Bruiniers, J., concurred.