Filed 1/29/16  County of Santa Clara v. Escobar CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| COUNTY OF SANTA CLARA, | H039600 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 1-11-CV201680) |
| v. | |
| JAVIER ESCOBAR, | |
| Defendant and Respondent. | |

This is the third of three related appeals, all decided today, concerning the remedies available to a county hospital after it provides treatment to a person who was injured through the tort of another.  (See *County of Santa Clara v. Fresh Express*, No. H038121 (*Escobar I*), and *Escobar v. Fresh Express, et al.; County of Santa Clara*, No. H038185 (*Escobar II*).)  Under Government Code section 23004.1 (Section 23004.1), the county in such a case acquires a right of action against the tortfeasor and, if the injured person also sues, a lien against the injured person's judgment.  Here we consider what remedies, if any, lie against the *injured person* when, with full knowledge of such a lien, he assumes dominion over the entire amount of the judgment, including the portion encumbered by the lien.  The court below concluded that the injured person thereby became a constructive trustee of the encumbered funds; that the county's pursuit of appropriate relief was not foreclosed by the Workers'

Compensation Act (Lab. Code, §§ 3600 et seq.) (sometimes Act); and that the record before it presented no triable issue of fact with respect to the reasonable value of the services rendered by the county. We find no error, and affirm.

<h1 style="text-align:center">BACKGROUND[1]</h1>

It is undisputed that Javier Escobar, the defendant and respondent here, was injured in a traffic accident on September 23, 2009. The parties agreed that the injuries were attributable to negligent operation of a vehicle by Jose Tinoco, who was acting within the course of his employment by Fresh Express, Inc. (Fresh Express). Escobar's injuries were treated at Santa Clara Valley Medical Center, which is owned and operated by plaintiff County of Santa Clara (County). According to a letter later written by Escobar's attorney recapitulating County's bills, County treated Escobar from September 23 to 24, and October 2 to November 24, 2009. County ultimately billed Escobar $1,249,545.38 for these services.

On or about October 30, 2009, Escobar submitted a claim to the Worker's Compensation Appeals Board (Board or WCAB), asserting that his injuries arose from his employment by Preferred Produce, Inc. On November 24, 2009, the employer's workers' compensation carrier notified Escobar that coverage was denied "because you were not in the course and scope of your employment when the motor vehicle accident occurred." The record does not reflect any further activity in the compensation proceeding until after County had asserted the lien at issue here.

On a date not competently established by the record, Escobar commenced a civil action in Monterey County Superior Court seeking damages for personal injuries from

---

[1] On our own motion, we take judicial notice of the records in the companion appeals, insofar as they assist in providing a complete picture of the background for the present appeal.

Tinoco and Fresh Express.[2]  A jury ultimately awarded Escobar $5,689,769.87 in total damages.  Included in the award was a specific finding that Escobar had sustained past economic damages of $1,894,483.57.  This was the sum set out in a stipulation by the parties in that action acknowledging the reasonableness and necessity of certain medical bills, including County's bill for $1,249,545.38.  (See pt. III, *post*.)  On December 14, 2010, the court entered judgment on the verdict.

Counsel for Escobar acknowledged below that prior to trial of the personal injury case, "we had received notices of liens against Mr. Escobar's recovery for medical services provided by a variety of medical providers, including a claimed lien by County in the amount of $1,249,545.38."  In January 2011, Fresh Express's insurer delivered a check in this amount to Escobar's attorney made payable to both his firm and to County.  Such a check could not be negotiated without the signatures of both payees.  (See Cal. U. Com. Code, § 3110, subd. (d).)  Escobar's attorney has refused to endorse the check, contending that it exceeds the sum to which County is entitled.

On May 21, 2011, County filed this action in Santa Clara County Superior Court, naming Escobar and Fresh Express as defendants.  As amended, the complaint asserted causes of action against Fresh Express for enforcement of County's rights under section 23004.1, against all defendants for money had and received, and against Escobar for quantum meruit and imposition of a constructive trust.  The complaint also sought a declaration that, in essence, at least one of the defendants is obligated to pay County the entire amount of its lien.

Nearly two months after County filed its amended complaint, and two years after the denial of Escobar's workers' compensation claim, the compensation carrier reversed its position and announced that it was "accepting [Escobar's] claim" and would "provide

---

[2]  Joining Escobar as plaintiffs were other persons who had apparently been co-passengers in the September 23 collision, or their spouses.

[him] with workers' compensation benefits."  This undertaking seems likely to have been illusory, since Escobar's judgment operated as a credit against any such benefits, and its size may have made it unlikely that the insurer would ever actually pay anything.  (See 2 Witkin, Summary of Cal. Law (10th ed. 2005) Workers' Compensation, § 73, p. 629.)

As more fully described in *Escobar I*, Fresh Express demurred successfully to the complaint, persuading the trial court that County's only remedy against it was to seek to enforce the lien in the Monterey court, which had issued the underlying judgment.  As more fully described in *Escobar II*, County thereupon initiated proceedings in the Monterey action to enforce the lien.  The Monterey court, however, denied relief on the ground that County's only remedy lay in pursuing this action against Escobar.  County appealed from those orders, which we reverse today in *Escobar I* and *Escobar II*.

After his own demurrer was overruled, Escobar moved for summary judgment on the ground that the WCAB had exclusive jurisdiction to determine County's entitlement to the disputed funds.  County in turn moved for summary adjudication on its causes of action for declaratory relief and to impose a constructive trust.  The court denied Escobar's motion and granted County's.  County dismissed the causes of action not adjudicated in its favor.  The court entered a judgment which (1) imposes a constructive trust on Escobar "with respect to a check provided to Escobar's attorney made payable to the Santa Clara Valley Medical Center and Escobar's attorney in the amount of $1,249.545.38," (2) orders Escobar to "direct his attorney to endorse the check" and deliver it to County, and (3) declares County "entitled to receive the sum of $1,249,545.38 against the Judgment obtained by Javier Escobar . . . ."  This timely appeal followed.

DISCUSSION

## I.  *Introduction*

The rules governing summary judgments and appeals therefrom have been too often recited to require reiteration here.[3]  (See, e.g., *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 710-711; *Browne v. Turner Const. Co.* (2005) 127 Cal.App.4th 1334, 1339.)  The fundamental question is whether, on the proofs before the court, County—as the moving party—was entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)  For these purposes the following facts appear to be uncontroverted:  that County perfected a lien pursuant to section 23004.1; that the lien operated as a charge or encumbrance upon any judgment Escobar might obtain in his personal injury action; that after he secured such a judgment, Fresh Express failed to honor or otherwise discharge the lien, but instead placed the proceeds under the control of Escobar's attorney by issuing a check that could not be negotiated without his endorsement; that the attorney refused to release the funds to County, insisting that its claim was excessive, and that exclusive jurisdiction to determine the correct amount was vested in the WCAB; and that County sought, by the causes of action at issue in its motion for summary adjudication, to impress a constructive trust upon the funds in Escobar's constructive possession (i.e., through counsel), and to require Escobar's attorney to surrender the funds to County.

It also appears, as discussed in part III, *post*, that Escobar's attorney entered into a stipulation in the underlying lawsuit, the precise tenor of which he now disputes, but

---

[3]  Although County styled its motion one for "summary adjudication," it did so only as a way of reserving its other causes of action for later adjudication, if necessary.  When the motion succeeded, County dismissed the reserved causes of action and thus obtained a judgment in its favor.  For all practical purposes the motion was one for summary judgment.

which appears on the face of the record to signify that the amount asserted in the County's lien reflected the reasonable value of the services rendered County to Escobar.

## II. *Exclusive Jurisdiction*

Escobar contends that the WCAB is vested with exclusive jurisdiction over the County's right to relief. There is no doubt that the Board is the exclusive forum to determine a worker's rights against his or her employer when the worker is injured in the course and scope of employment. (See Lab. Code, § 3602, subd. (a).) It is also the exclusive forum for various ancillary controversies, including the right of a medical provider to recover from the employee, the employer, or the employer's compensation insurer, for services provided to "cure or relieve" a compensable injury. (Lab. Code, § 4600, subd. (a); see *id*., §§ 5300, 5304.) This is because under the Workers' Compensation Act, it is the employer's obligation to provide, or pay for, "[m]edical . . . and hospital treatment . . . that is reasonably required to cure or relieve the injured worker from the effects of his or her injury." (Lab. Code, § 4600, subd. (a).) In order to fairly regulate the burden thus imposed, the workers' compensation law must provide a mechanism by which the provider of such treatment may seek reimbursement, and the employer—if it chooses—may contest the provider's claim. This mechanism takes the form of a "lien" granted to the treatment provider "against any sum to be paid as compensation," for what the Board determines to be the "reasonable" medical expenses "incurred by or on behalf of the injured employee." (*Id*., § 4903, subd. (b).) The sums to be allowed are determined according to an "official medical fee schedule" promulgated by the Board. (Lab. Code, § 5307.1) These provisions extend to "medical-legal" services, which means professional services rendered in aid of prosecuting the compensation claim itself. (*Adams v. Workers' Comp. Appeals Bd.* (1976) 18 Cal.3d 226, 231; Lab. Code, §§ 4064, subd. (a), 4620, subd. (a).)

6

In view of these provisions, a medical provider seeking compensation for treating an industrial injury must ordinarily assert a "medical lien" in the worker's compensation case. (See generally Foust, California Lien Claims in Workers' Compensation Cases (2014-2015 ed.), ch. 2 ["Medical Treatment Liens"]; cf. *id.*, ch. 3 ["Medical-Legal Liens"].) Not surprisingly, the Board's jurisdiction over such proceedings is exclusive. (See *Perrillo v. Picco & Presley* (2007) 157 Cal.App.4th 914, 919, 928, 932; *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 815 (*Vacanti*).) Medical providers are barred from seeking to collect directly from injured workers for services within the purview of the Act. (Lab. Code, § 3751, subd. (b); see *Bell v. Samaritan Medical Clinic, Inc.* (1976) 60 Cal.App.3d 486, 490 (*Bell*); *Workmen's Comp. Appeals Bd. v. Small Claims Court (Early-Winston-Drake)* (1973) 35 Cal.App.3d 643, 647.) Indeed, since 1990, the Act has imposed penalties on medical providers who "collect money directly from the employee for services to cure or relieve the effects of [an industrial] injury." (Lab. Code, § 3751, subd. (b) (section 3751(b).) [4]

The present action, however, is not an attempt to "collect money directly from the employee for services to cure or relieve the effects of [an] injury," as proscribed by section 3751, subdivision (b). Nor is it an attempt to recover from an employer or its compensation carrier. This is, rather, an attempt to *enforce a lien* granted by statute against specific property, i.e., the civil judgment rendered in the Monterey action. In a historical sense the lien arose from a debt incurred by Escobar. (See *City and County of*

---

[4] "If an employee has filed a claim form pursuant to Section 5401, a provider of medical services shall not, with actual knowledge that a claim is pending, collect money directly from the employee for services to cure or relieve the effects of the injury for which the claim form was filed, unless the medical provider has received written notice that liability for the injury has been rejected by the employer and the medical provider has provided a copy of this notice to the employee. Any medical provider who violates this subdivision shall be liable for three times the amount unlawfully collected, plus reasonable attorney's fees and costs." (Section 3751(b).)

7

*San Francisco v. Sweet* (1995) 12 Cal.4th 105, 117 (*Sweet*); *Parnell v. Adventist Health System/West* (2005) 35 Cal.4th 595, 606 (*Parnell*).)  But it also embodies a liability directly imposed on Fresh Express and Tinoco—the defendants in the action in which the lien was asserted—by section 23004.1.  The present action is not an attempt to collect on Escobar's debt as such, but to enforce the liability and lien imposed on the tortfeasors.  It is brought against Escobar not because of any underlying indebtedness of his, but because he, through his attorney, has wrongfully appropriated property belonging to County.  So far as this action is concerned, Escobar is no different from any other person who might have misappropriated County funds with notice of County's ownership.

Section 23004.1 provides that when a county provides medical care to someone who has been injured through the tort of another, the county is entitled to recover *from the tortfeasor* the reasonable value of services thus rendered.  The county may bring an action against the tortfeasor, but if the injured person brings suit on his or her own behalf, "the county's right of action shall abate during the pendency of such action, and continue as a first *lien against any judgment* recovered by the injured . . . person . . . against the [tortfeasor], to the extent of the reasonable value of the care and treatment so furnished or to be furnished."  (Section 23004.1, subd. (b).)

Here Escobar received treatment from County for injuries for which Tinoco and Fresh Express were liable in tort.  Under the statute, these facts vested County with a right of action against Tinoco and Fresh Express.  That right abated when Escobar brought his own action against the tortfeasors, but County then acquired a "first lien" in the judgment subsequently entered against them.

Code of Civil Procedure section 1180 defines a "lien" as "a charge imposed upon specific *property*, by which it is made security for the performance of an act."  (Italics added; see Civ. Code, § 2872.)  In this case the charge was imposed on Escobar's judgment against Fresh Express.  (See *Mercy Hospital & Medical Center v. Farmers Ins.*

8

*Group of Companies* (1997) 15 Cal.4th 213, 217 (*Mercy Hospital*), italics added [lien under similar act vests hospital with "a direct right to a certain percentage of *specific property*, i.e., a judgment"].)[5] When Escobar's counsel took possession of that property with knowledge of the lien, County was entitled to impress a constructive trust upon it. By seeking to do so, County was not engaging in the conduct proscribed by section 3751(b), i.e., attempting to "collect money directly from the employee."

Escobar makes no attempt to identify any other specific language in the Workers' Compensation Law that bars County's action. He alludes to Labor Code section 5304, but does not explain how County's actions contravene its actual terms. He simply cites it for the proposition that the "WCAB has exclusive jurisdiction over th[is] matter." The statute grants the Board "jurisdiction over any controversy relating to or arising out of Sections 4600 to 4605 inclusive." (Lab. Code, § 5304.) Twenty code sections fall within the designated range. Escobar makes no attempt to demonstrate that the present controversy is embraced by any of these sections. It is his burden to demonstrate error. (*Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 913.)

Instead of attempting to establish a statutory basis for his argument, Escobar quotes *Bell*, *supra*, 60 Cal.App.3d 486, 490, which in turn cited Labor Code section 5304 for the proposition that when "the employer accepts liability under section 4600, the exclusive jurisdiction of the Board attaches with respect to *any* controversy relating to the amounts to be paid for the services rendered by the physician." This statement is certainly true insofar as it relates to amounts to be paid by the employer, its insurer, or the

_____

[5] The quoted decision arose under the Hospital Lien Act, Civil Code sections 3045.1 through 3045.6. (*Mercy Hospital*, *supra*, 15 Cal.4th at p. 217.) That act creates a lien that differs in several particulars from the lien created by Section 23004.1. For immediate purposes, however, the two liens are conceptually similar. (See *Parnell*, *supra*, 35 Cal.4th 595, 607, quoting *Day v. Alta Bates Medical Center* (2002) 98 Cal.App.4th 243, 253 [section 23004.1 and Hospital Lien Act " 'should be similarly construed and applied' "].)

employee for treatment to cure or relieve an industrial injury.  But the judgment before us does not require any such payment.  It requires Escobar to surrender possession of County property he wrongfully obtained from a third party tortfeasor who was independently liable to County.

The *Bell* decision is far removed from any issue before us.  That case was brought to enjoin a practice that has come to be known as "balance billing," under which the defendant medical providers collected whatever they could from an injured worker's employer, or its insurer, and then billed the worker for any remaining balance.  (Cf. *Prospect Medical Group, Inc. v. Northridge Emergency Medical Group* (2009) 45 Cal.4th 497, 502 [statutes barred emergency room doctors from billing patients for balance unpaid by health maintenance organization]; *Serafini v. Blake* (1985) 167 Cal.App.3d Supp. 11, 19 [physician's efforts to collect from patient were barred by prohibition against balance billing under Medicaid laws].)  It was this practice that the Legislature sought to abolish—and penalize—by enacting section 3751(b).  (See Assem. Fin. and Ins. Subcom. on Health and Workers' Ins., Rep. on Assem. Bill 2695 (1989-1990 Reg. Sess.), May 7, 1990 (proposed amendment), p. 1.)[6]  In *Bell* the court appeared to conclude that the practice violated section 5304, though it made no attempt to explain how it "relat[ed] to or ar[o]s[e] out of Sections 4600 to 4605 inclusive."  (Lab. Code, § 5304.)

Labor Code section 3600 explicitly limits the liability of an *employer* for industrial injuries.  Language of exclusivity also appears in Labor Code section 5300

---

[6] Balance billing is also prohibited under the MediCal law, which declares that a MediCal payment "shall constitute payment in full."  (Welf. & Inst. Code, § 14019.3, subd. (d).)  The act requires providers to repay any sums paid to them by a MediCal beneficiary.  (*Id*., sub. (e).)  However, it explicitly contemplates that a provider may recover from any third party who is contractually bound to "pay the charges for the care provided to a beneficiary."  (*Id*., subd. (d).)

10

(Section 5300), which provides that a number of types of proceedings "shall be instituted before the appeals board and not elsewhere . . . ." The first four types of proceedings are fairly specific and clearly inapplicable here.[7] The fifth category concerns proceedings "[f]or obtaining any order which by Division 4 ["Workers' Compensation and Insurance"] the appeals board is authorized to make." (Section 5300, subd. (e).) This is obviously not a proceeding to obtain such an order; the Board has no power to impose a constructive trust or to declare the rights of a holder of a judgment lien. The sixth, catchall category concerns proceedings "[f]or the determination of any other matter, jurisdiction over which is vested by Division 4 in the Division of Workers' Compensation . . . ." (*Id.*, subd. (f).) But this brings us back to the complete absence of a showing by Escobar that the Board has exclusive, or any, jurisdiction over County's right of action here.[8] (*Ibid.*) Again, the burden rests squarely on him to affirmatively demonstrate error. We will not attempt to identify, let alone analyze, every argument he might have made.

---

[7] These are proceedings "(a) For the recovery of compensation, or concerning any right or liability arising out of or incidental thereto. [¶] (b) For the enforcement against the employer or an insurer of any liability for compensation imposed upon the employer by this division in favor of the injured employee, his or her dependents, or any third person. [¶] (c) For the determination of any question as to the distribution of compensation among dependents or other persons. [¶] (d) For the determination of any question as to who are dependents of any deceased employee, or what persons are entitled to any benefit under the compensation provisions of this division." (Section 5300.)

[8] Further, if Escobar succeeded in establishing that enforcement of the statutory lien *would* conflict with the Workers' Compensation Act, he would only be half-finished. We could not simply assume that one statute prevailed over the other; the conflict would have to be resolved by some principled rationale. Here, enforcing Welfare and Institutions Code section 23004.1 by its terms poses no obvious impairment to the objectives served by the compensation law, whereas denying County the relief to which it would otherwise be entitled obviously impairs the legislative objective of securing full reimbursement to County and thereby reducing the burden on its taxpayers of providing medical services to persons injured through tortious conduct.

11

Escobar quotes the statement in *Hand Rehabilitation Center v. Workers' Comp. Appeals Bd.* (1995) 34 Cal.App.4th 1204, 1212, that "[t]he WCAB has exclusive jurisdiction over medical liens." But that is a reference to the type of lien filed by a medical provider in a compensation proceeding, which attaches to the "sum to be paid as compensation." (Lab. Code, § 4903.) Here we are concerned with a *judgment lien*, which attaches to a judgment recovered, or to be recovered, in a civil suit.[9] No authority cited by Escobar or known to us vests the Board with jurisdiction over such a lien.

Also inapplicable here is the observation in *Vacanti, supra,* 24 Cal.4th 800, 815, which Escobar quotes, that "claims seeking compensation for services rendered to an employee *in connection with his or her workers' compensation claim* fall under the exclusive jurisdiction of the WCAB." (Italics added.) This is a reference not to ordinary medical *treatment*, such as this case concerns, but to "medical-legal liens," which are claims submitted in a compensation proceeding for services, such as the preparation of medical reports, *in aid of the underlying compensation claim*. (See Foust, California Lien Claims in Workers' Compensation Cases, *supra*, ch. 3 ["Medical-Legal Liens"]; cf. *id*., ch. 2 ["Medical Treatment Liens"].) Naturally the Board has exclusive jurisdiction over such liens. That does not give it jurisdiction over the *judgment* lien at issue here.

---

[9] The term "judgment lien" is itself burdened with an unfortunate dual meaning. It can refer to a lien like the one here, which *attaches to* a money judgment to satisfy a debt arising prior to rendition—typically, for legal or medical services associated with prosecuting the case or treating the underlying injury. (E.g., *Sweet*, *supra*, 12 Cal.4th 105, 116 [referring to lien under section 23004.1 as a "judgment lien"]; *Casa Eva I Homeowners Ass'n v. Ani Const. & Tile, Inc.* (2005) 134 Cal.App.4th 771, 774 [referring to judgment creditor's lien against pending action as a "judgment lien"].) It is also used to describe a lien that *arises from* a judgment, after its rendition, and attaches to *other property* of the judgment debtor as a means of collecting on the judgment. (See Code Civ. Proc., § 697.060, subd. (a); *Title Trust Deed Service Co. v. Pearson* (2005) 132 Cal.App.4th 168, 175; 8 Witkin, Cal. Procedure (5th ed. 2008) Enforcement of Judgments, §§ 64 et seq., pp. 106 et seq.) We are here concerned with a lien *on*, as opposed to one *arising from*, a judgment.

### *III. Reasonable Value*

A county's recovery under section 23004.1 is limited to "the reasonable value of the care and treatment . . . furnished" by the county. (Section 23004.1, subds. (a), (b).) It is undisputed that the $1,249,545.38 asserted in County's lien was the full amount billed by it for its treatment of Escobar. County bore the burden of establishing that this sum represented the reasonable value of its services. (See Code Civ. Proc., § 437c, subd. (c); *State Farm Mutual Automobile Insurance Co. v. Huff* (2013) 216 Cal.App.4th 1463, 1470 [applying Hospital Lien Act].) County sought to carry this burden by presenting evidence of a stipulation entered in the Monterey personal injury action concerning certain medical bills, including County's.

Prior to trial of Escobar's tort suit, County duly gave notice that it asserted a lien in the amount of $1,249,545.38. During trial Escobar's attorney included this amount— and a copy of County's "lien breakdown"—in a letter he sent to other counsel. He wrote, "This confirms our conversation of today about stipulating to medical bills to save time. [¶] Enclosed please find the bills that I would appreciate the defendants stipulating to, relative to necessity and reasonableness."

On the next court day, the parties entered into a stipulation as follows: "MR. MARKOWITZ [counsel for Escobar]: . . . As to the past medical bills, not the ones we have paid, but the outstanding bill from the hospitalizations, there has been a stipulation as to the amounts. We sent a letter over last week and I was informed by Mr. Bodzin that they would stipulate to those amounts. [¶] And based upon that, we're not going to be calling Dr. Brones to the stand. THE COURT: Thank you. [¶] MR. BODZIN [counsel for defendants]: Yeah. And Your Honor, that is the letter of Joseph Carcione from November 19th; we received that by fax at about—I think about a little after 4:00 o'clock in the afternoon on Friday. [¶] THE COURT: All right.

13

[¶] MR. BODZIN: So the stipulation is based upon what's in that letter as agreed to by the defense."

As set forth in the letter, the total amount of the "liens" on Escobar's recovery—including County's $1,249,545.38—was $1,894,483.57. This was the exact amount of "past economic damages" ultimately reflected in the jury's special verdict. County contends that this finding, or the stipulation itself, was *conclusive* for purposes of this action. Escobar correctly contests these propositions, but overlooks the stipulation's effect as *evidence*. He also contends that it is controverted by other evidence in the record, but these contentions do not survive scrutiny.

In support of its motion for summary judgment, County argued that the jury's finding collaterally estopped Escobar from contesting the reasonable value of County's services. As this court has written, collateral estoppel, or issue preclusion, bars a party from relitigating "*specific issues* that were actually litigated in an earlier proceeding and decided adversely to the party against whom the doctrine is asserted." (*Ferraro v. Camarlinghi* (2008) 161 Cal.App.4th 509, 531.) The requirements for successful invocation of this doctrine are: (1) the issue must be identical to the one previously decided; (2) it must have been "actually litigated" in the previous matter; (3) it must have been necessarily decided in that matter; (4) the decision must have been on the merits, and must now be final; and (5) the party against whom the doctrine is invoked must be the same as, or in privity with, the party against whom the issue was previously decided. (*Ibid.*)

We doubt that either the first or the second element can be found in this case. The issue actually decided in the personal injury trial was the total value of Escobar's "past economic damages." The issue here is the reasonable value of the medical services County furnished to Escobar. That issue was not *necessarily* decided in the former case; indeed, it does not appear to have been "actually litigated," since the parties stipulated to

14

it.  A stipulation "may have preclusive effect *as between the parties* to the underlying stipulation, but not because it satisfies the criteria for claim preclusion or issue preclusion.  Rather it is binding on the parties to the extent they have *consented* to be bound by it." (*Ferraro v. Camarlinghi, supra,* 161 Cal.App.4th at p. 540.)  Thus it will generally receive preclusive effect in a subsequent matter "only when the parties manifest an intent for it to do so." (*Id.* at p. 541, quoting *Tennison v. California Victim Compensation and Government Claims Bd.* (2007) 152 Cal.App.4th 1164, 1176.)  We are directed to no evidence that any of the parties to the stipulation, including Escobar, intended it to bind them beyond the trial of that matter.

Giving conclusive effect to a stipulation beyond the parties' intentions may be expedient in a particular lawsuit but destructive of the broader goals of fairness and judicial economy.  It creates a disincentive for counsel to enter into stipulations whenever they perceive a risk that the stipulation might become conclusive evidence against their clients in some other case.  Stipulations, of course, can be very helpful in bringing about the efficient resolution of disputes.  Any rule that discourages their use should be considered and applied with the greatest circumspection.  A rule categorically giving unintended effects to all stipulations could hardly help but deter parties from entering into them, with consequent increases in delay and expense for all concerned.  County cites cases for such a rule.  (See *Harris v. Spinali Auto Sales, Inc.* (1966) 240 Cal.App.2d 447, 452-453, citing inter alia *Gonzales v. Pacific Greyhound Lines* (1950) 34 Cal.2d 749, 755.)  But to the extent they actually support such a rule, we question whether they reflect the current state of the law.  (See *Landeros v. Pankey* (1995) 39 Cal.App.4th 1167, 1171-1172; *Ferraro v. Camarlinghi*, *supra,*161 Cal.App.4th at pp. 540-541.)

We need not finally decide this issue, however, because our reluctance to treat the stipulation as conclusive does mean it lacks any effect.  Both the stipulation and the letter which it essentially incorporated still constitute evidence—specifically, vicarious

15

admissions by Escobar, through counsel, that County's "lien breakdown" stated the reasonable value of its services. (See Evid. Code, § 1222.) This direct admission was sufficient to carry County's initial burden on summary judgment, as moving party, to establish a right to judgment in the absence of controverting evidence. The question then becomes whether Escobar offered such contrary evidence as would raise a triable issue of fact.

Escobar contends that (1) the stipulation did not concern the reasonableness of County's bills but rather the total amount of Escobar's economic damages as of the date of trial; (2) Escobar in fact sustained economic damages not included in counsel's letter, which preclude treating the verdict as a simple incorporation of the figures in the letter; (3) upon scrutiny, County's bills on their face support a finding of unreasonableness; and (4) deposition testimony by County representatives supports an inference that County's bills exceeded its own conception of reasonable value.

Escobar's construction of the stipulation rests on the declaration of his trial attorney in opposition to summary judgment: "During the trial, the undersigned and his partner, Joseph W. Carcione, Jr., engaged in discussions with counsel for Fresh Express, Ray Greene, regarding whether a stipulation could be reached as to the total value of all of Mr. Escobar's past economic damages. It was ultimately agreed that the parties would stipulate that Mr. Escobar's total past economic damages would be $1,894,483.57. This award was meant to compensate Mr. Escobar not only for the services that medical providers had filed liens for, but also his other past economic damages for which no lien was filed, but that Mr. Escobar had the right to recover damages for, such as his lost earning capacity and his home care services. This compromise recognized that the parties could spend considerable time going over the value of each service and element of damages, but that the total of filed liens reasonably approximated his total economic damages. At no time was any specific element of these past economic damages the

16

subject of a stipulation, but instead the stipulation was only to the total past economic damage award."

We cannot accept this construction. "A stipulation of counsel, like other agreements, must be construed by an objective standard. It is immaterial that one of the parties had an undisclosed intention or belief as to what it meant." (*Consolidated Dock & Storage Co. v. Superior Court* (1971) 18 Cal.App.3d 949, 952; see *Dowling v. Farmers Ins. Exchange* (2012) 208 Cal.App.4th 685, 694 ["We interpret a stipulation, including a stipulation entered as a court order, in accordance with the ordinary rules of contract interpretation."]; *Chacon v. Litke* (2010) 181 Cal.App.4th 1234, 1252, quoting Civ. Code, § 1636 ["As a contract, a stipulation ' "must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." ' "]; *Salazar v. Upland Police Dept.* (2004) 116 Cal.App.4th 934, 943 ["Plaintiff and her attorneys' subjective expectations as to the stipulation . . . are irrelevant."].)

Of course, we are here construing a stipulation to ascertain not its direct legal effect, but rather its *evidentiary* effect as an admission of a party. But that does not mean that the stipulating party can raise a triable issue of fact merely by asserting that he did not mean what the stipulation said. "In reviewing motions for summary judgment or adjudication, courts have long tended to treat affidavits repudiating previous testimony as not constituting substantial evidence of the existence of a triable issue of fact." (*Alvis v. County of Ventura* (2009) 178 Cal.App.4th 536, 549.) The same reasoning may apply even if the "prior statement was not in the form of testimony under oath." (*Ibid.*) "We cannot accept as substantial evidence of a triable issue of fact a declaration that directly contradicts the declarant's prior statement, where the contradiction is unexplained." (*Ibid.*)

17

Here counsel's letter proposed not that the parties stipulate to a sum for "total past economic damages," but that the *medical bills* listed in the letter—including County's—be "stipulat[ed] to, *relative to necessity and reasonableness*." (Italics added.) This was the proposal to which assent was manifested on the record. At that time counsel for Escobar again said that the stipulation concerned "the past medical bills." Defense counsel clarified that "the stipulation is based upon what's in that letter as agreed to by the defense." The plain meaning of these proceedings is that the parties stipulated to the "necessity and reasonableness" of the bills listed in the letter, not to a lump sum award embracing all items of past economic damage.

In light of these facts, counsel's attempt to vary the terms of the stipulation is simply too insubstantial to raise a triable issue of fact. His declaration identifies no objective manifestation of the supposedly different intention he describes. It is fatally vague as to timing, suggesting only that this altered stipulation was "ultimately" reached. Tellingly, he offers no transcript of any proceedings where this version of the stipulation was memorialized, nor any instruction that might have been given to the jury (by stipulation or otherwise) on that subject. He offers no declaration or other statement from any other participant in the proceeding. Indeed, he retreats to the passive voice—the last refuge of the obfuscator—by asserting that "[i]t was ultimately agreed" that the stipulated amount would represent all of his client's economic damages, and that this sum "was meant" by unidentified persons to "compensate Mr. Escobar not only for the services that medical providers had filed liens for, but also his other past economic damage." He describes this as a "compromise" and attributes it to the parties' recognition that they otherwise "could spend considerable time going over the value of each service and element of damages, but that the total of filed liens reasonably approximated his total economic damages."

18

Counsel's declaration is entirely consistent with the hypothesis that *after* the parties had stipulated to the "necessity and reasonableness" of the bills listed in his letter, counsel simply elected to forego proof of other special damages, with the result that stipulated medical bills became the only foundation for an award of economic damages. In any event, as already noted, the question is not whether the stipulation *conclusively* established the reasonableness of County's bills but whether it grounded an inference sufficient to carry County's burden in moving for summary judgment. Whatever else may be said, both the stipulation as objectively manifested, and the letter it incorporated, constitute vicarious admissions that the County's charges were necessary and reasonable. Even if it were competently established that the parties had ultimately modified the stipulation, that would not alter the character of the stipulation and the letter as substantial evidence. It would at most open the door to conflicting evidence. It cannot, by itself, raise a triable issue of fact.

This brings us to Escobar's contention that the *un*reasonableness of County's bill can be inferred from its own billing records. This argument appears to rest on the presence in the records of a credit for $199,195.39, which was not reflected in the total amount billed to Escobar, and which County's witnesses on this subject failed, according to Escobar, to explain. In its reply to Escobar's opposition to summary judgment, County conceded that one witness was unable to explain this entry, but presented deposition testimony by a second witness to the effect that the entry reflected limitations on Medicare coverage and was relevant only in that context. Escobar ignored this testimony, citing instead a deposition passage which, he says, establishes that the entry could not be explained without consulting documents that County had failed to produce. Escobar echoes these assertions on appeal without mentioning the Medicare testimony.

Escobar cites three successive pages of the deposition in question, only one of which appears in the record. The testimony on that page is far too ambiguous to support

19

the construction Escobar places on it.[10]  Escobar asserts that County failed to produce notes from the "Invision System" which the witness supposedly said were necessary to explain the entry.  No part of this sentence is borne out by the cited transcript page.  Counsel for County may have implicitly conceded it, in part, by asserting in a reply memorandum that the Invision notes had been supplied to Escobar's counsel before his opposition to summary judgment was due.  This assertion merely adds further perplexities, however, for it too lacks adequate support in the cited declaration and exhibit.  Ultimately, all that appears is that the witness attributed the questioned entry to internal bookkeeping procedures involving Medicare coverage and that no other evidence on this subject was before the court.  In this state, the record did not controvert the inference of reasonableness arising from counsel's letter and stipulation.

Escobar's final attack on the judgment is that a County witness testified, as he puts it, "that when a patient is injured in the course and scope of employment, the County always accepts the amount from the Workers' Compensation Official Medical Fee Schedule as payment in full."  This testimony precluded summary judgment, he asserts, because "the reasonable value of medical services is must [*sic*] be determined by the

---

**10**  The designated passage apparently begins in the middle of remarks which we infer were made by counsel for Escobar:

"[MR. MARKOWITZ:] . . . She said that there are other notes on the account—

"MR. SCHMID: Those are the account—

"MR. MARKOWITZ:  Not according to your witness.

"THE WITNESS:  What I stated was the exhibits that you have are the comments made to this, these accounts.  The payments and adjustments are different criteria.

"What you have here is all of the 'system notes' that were generated for this account and all of the notes that were entered into our system by an individual either from our Admitting Office or by Patient Business Services."

20

amount that the medical provider customarily accepts as payment in full. (See *Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298 [(*Nishihama*)].)" Neither the factual nor the legal premise for this argument is sound.

The legal premise fails because the cited decision does not support it.[11] The court there held that under the Hospital Lien Act, a hospital could not recover an amount based on its billed charges when it had actually accepted a substantially lesser amount as full payment pursuant to a pre-existing agreement with a medical insurance provider. The Supreme Court later adopted a similar holding. (*Parnell*, *supra*, 35 Cal.4th 595, 609.) The court in *Nishihama* observed that the act limited the hospital's lien to the amount the hospital was " 'entitled to receive as payment.' " (*Nishihama, supra,* 93 Cal.App.4th at p. 308, quoting Civ. Code, § 3045.4; italics omitted.) Since the hospital was only entitled to receive what it had agreed with the insurer to accept, that sum fixed the ceiling for its lien claim. This holding has no apparent bearing on the present case, where there is no evidence of an agreement by County to accept anything less than the amount billed for its services.

Escobar's argument also mischaracterizes the cited deposition testimony. The witness first testified that it was "our normal procedure for workmen's comp carriers to accept the workmen's comp fee schedule." She then testified that it was "the practice" to send to "any payer" a bill stating the "full value of charges." She understandably resisted efforts by her interrogator to elicit testimony that the treatment of workers' compensation cases was like that of patients as to whom the County was bound to a fee schedule by contract. Instead, she testified, "[I]f a facility is seeing a workmen's comp patient, . . . they have to accept what is in the workmen's comp fee schedule. [¶] Because it's a standard fee schedule developed by Workmen's Comp Department." She then

---

[11] As is often true, the absence of a specific page cite is a red flag.

21

acknowledged that where payment was received according to the schedule, "We would not be asking the patient for the difference . . . ." This testimony appeared to establish nothing more than that in cases subject to workers' compensation law, the County complied with that law. This had no tendency to establish that the amounts billed in other cases did not constitute reasonable charges for purposes of Section 23004.1.

## IV. Attorney Fees

Finally, as previously mentioned, Escobar asserts that if County's arguments are accepted, its recovery must be reduced to reimburse Escobar for a portion of his attorney fees under the "common fund" theory of fee recovery. Assuming this argument is properly before us, we reject it under constraint of binding authority.[12]

Escobar's argument rests on an attempt to distinguish *Sweet*, *supra*, 12 Cal.4th 105, where the court held that the common fund theory was *not* available to reduce a county's lien recovery under Section 23004.1. Escobar contends that the rationale of this case is inapplicable where, as he contends to be the case here, the county would be barred by the Workers' Compensation Act from seeking to collect directly from the patient. This contention requires a review of the reasoning in that case.

The court in *Sweet* described the common fund doctrine as resting on "the common law 'historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorney fees, from the fund or property itself or directly from the other parties enjoying the benefit.' " (*Sweet*, *supra*, 12 Cal.4th at p. 110.) The

---

**12** It is far from clear that Escobar has properly tendered the issue of attorney fees. The logical forum to litigate that issue would seem to have been the Monterey court, which had the lien before it. The Santa Clara court, in turn, was asked to adjudicate County's claim that Escobar had wrongfully appropriated the entire lien. Assuming a claim for attorney fees was available to Escobar in that court, it would seem to have required that he pray for such relief in an appropriate pleading. It might be sufficient to assert an affirmative defense of setoff, but no such defense appears in Escobar's answer.

doctrine "has been recognized and applied consistently in California when an action brought by one party creates a fund in which other persons are entitled to share." (*Id.* at pp. 110-111, fn. omitted.) However, the court concluded, the doctrine did not extend to actions subject to a lien has attached under section 23004.1, because such an action is not "taken for the benefit of the plaintiff's creditors," such as the county, but "is prosecuted for the benefit of the plaintiff." (*Id.* at p. 116.) "The plaintiff's creditors do not have an interest in the recovery in common with the plaintiff. That the creditors may benefit from any recovery is an incidental, not an intended, benefit of the litigation. [Citations.] Unlike the interest of other claimants to a common fund, the creditor's right to payment is not contingent on litigation which creates a fund. Thus, no equitable principles justify departure from the statutory command of Code of Civil Procedure section 1021 that each party to litigation bear the expense of its own attorney fees." (*Id.* at p. 117, fn. omitted.)

Escobar's argument rests on the court's repeated references to the injured plaintiff's independent indebtedness, in such cases, to the county.[13] (See *Sweet*, *supra*, 12 Cal.4th at pp. 116-117, fn. omitted ["No case has been called to our attention which suggests that a creditor's recovery on a judgment lien should be reduced by an amount attributable to the plaintiff's litigation expenses in an action which provides a source of payment of the debt."]; *id.* at p. 117 ["The fact remains that defendant Sweet received services from the county for which payment was due. He was a debtor whose assets the county had a preexisting right to pursue regardless of the source of those assets."]; *id.* at p. 118 ["the common fund doctrine has no applicability when the relationship of the

_____

[13] The only language from *Sweet* actually quoted in Escobar's brief comes from a portion of the opinion summarizing the reasoning in another decision, *Lindsey v. County of Los Angeles* (1980) 109 Cal.App.3d 933. (See *Sweet*, *supra*, 12 Cal.4th at p. 114.) While the Supreme Court manifestly approved of that decision, its description of it must be distinguished from the high court's own reasoning, the statement of which begins two pages later. (*Id.* at p. 116.)

23

litigation plaintiff and the hospital lien claimant is that of debtor and creditor"]; *id.* at p. 120 ["a county hospital in this state is not limited to recovery from the third party tortfeasor," but "may recover the sums due from any after-acquired assets of the debtor"].)  From this it might be supposed that Escobar would seek to distinguish *Sweet* on the ground that—assuming the applicability of section 3751(b)—County could not have sued Escobar directly.  Instead he again asserts that based on the County's "normal billing practices" as described in testimony by a hospital billing supervisor, "Mr. Escobar would only owe the [WCAB] Official Medical Fee Schedule amounts."  From this he reasons that the judgment against Fresh Express conferred a "huge benefit" upon County because it enabled County to recover more than the amounts it supposedly would have accepted otherwise.

This argument suffers from several defects.  First, as we have already noted, the cited deposition testimony appears to convey no more than the witness's recognition that when an injury is covered by workers' compensation, the hospital's recovery is ordinarily limited to the scheduled charge for the services provided.  The testimony cannot be understood to mean that the patient "owe[s]" less in those cases—only that the County accepts less in recognition of the constraining effects of the workers' compensation laws. We have already concluded that those constraints do not preclude a recovery on County's statutory lien.

Second, it may be conceded that County received a benefit from the litigation, but neither that nor anything else we can glean from Escobar's argument renders the rationale of *Sweet* inapplicable.  The county there also received a benefit from the litigation.  Had it secured a judgment against its patient, it might have discovered that he was unable to satisfy it.  Had it pursued its own right of action against the tortfeasor—and had relief not been foreclosed by principles of subrogation—it would have incurred the expenses of that litigation.  But the court was manifestly unmoved by such considerations, implicitly

24

concluding that similar benefits are conferred upon every creditor who attaches a lien to a judgment recovered, or to be recovered, by the debtor.  The court declared that any benefit to creditors in such cases "is an incidental, not an intended, benefit of the litigation." (*Sweet*, *supra*, 12 Cal.4th at p. 117.)  The court held that the creditors' did "not have an interest in the recovery in common with the plaintiff," and that in contrast to claimants to a common fund, their "right to payment is not contingent on litigation which creates a fund." (*Ibid*.)  Nothing in Escobar's argument meaningfully distinguishes this reasoning.

Escobar also suggests that he conferred a valuable benefit on County by "establish[ing] the reasonable value of the medical services"—presumably a reference to the stipulation on which County relied to carry its motion for summary judgment.  But this benefit was no less "incidental" than the benefit conferred on County by the judgment itself.  Escobar overstates both of them, for if he had not sued the tortfeasors, County would have been free to do so.  (Section 23004.1, subd. (a).)  The real benefit to County was the savings in legal expenses it would have incurred in such an action.  We do not wish to minimize this effect, but it is the same one that failed to move the Supreme Court in *Sweet*.  Escobar has offered no reason to conclude that the holding of that case does not govern here.

Even further from the mark is Escobar's claim that he conferred a special benefit on County by "holding [its] money in a 'constructive trust.' "  This was hardly a benefit; nor did it reflect any beneficent intent, purpose, or effect attributable to Escobar.  The trial court *imposed* a constructive trust on him because he intercepted and took control of property that rightfully belonged to County.  Far from conferring a benefit on County, this conduct has deprived it, for some five years, of funds to which it was entitled.

We can conceive of circumstances in which a patient in Escobar's position might indeed confer a benefit on a lien claimant that is so different in kind from the ones noted

25

in *Sweet* as to justify a different result. For example, we would question the viability of *Sweet*'s rationale as applied to a case where an injury action could only be maintained in a foreign jurisdiction, particularly one which would not recognize a county's statutory right of action under Section 23004.1. In such a case it could be said that there was a valid subsisting indebtedness as noted in *Sweet*, but no prospect of recovery without the patient's own suit against the tortfeasor. Under a proper argument, such a result might even be obtained where the barrier to direct relief is something other than geographic— conceivably even the exclusive remedy provisions of the workers' compensation law. We have narrowly tailored our analysis of this question to the arguments as framed by Escobar. We find those arguments insufficient to distinguish *Sweet* from this case. We therefore conclude that the trial court did not err by failing to reduce County's recovery pursuant to the common fund doctrine.

## DISPOSITION

The judgment is affirmed. County will recover its costs.

_____
RUSHING, P.J.

WE CONCUR:

_____
PREMO, J.

_____
ELIA, J.

27